Alan GRAYSON, Appellant,

v.

AT & T CORPORATION,
et al., Appellees.

Paul M. Breakman, Appellant,

v.

AOL LLC, Appellee.

Nos. 07–CV–1264, 08–CV–1089.

District of Columbia Court of Appeals.

Argued en banc June 22, 2010.
Decided Jan. 20, 2011.

Victor Kubli, Vienna, VA, and Walter Dierks, with whom Frederick D. Cooke, Jr., was on the brief, and with whom Frederick D. Cooke, Jr., Jeffrey Harris, Washington, DC, Kevin F. Rooney, Andrew A. August, and Giancarlo Terilli, New York, NY, were on the reply brief, for appellants.

Jay P. Lefkowitz, New York, NY, with whom Daniel Forman, Aryeh S. Portnoy, Thomas E. Gilbertsen, John E. Villafranco, Michael F. Williams, Gregory L. Skidmore, Arjun Garg, Washington, DC, John D. Wilburn, Anand V. Ramana, McLean, VA, and Daniel T. Donovan, Washington, DC, were on the brief, for appellees.

Bonnie I. Robin–Vergeer, with whom Deepak Gupta, Washington, DC, was on the brief, for amicus curiae the Legal Aid Society of the District of Columbia, Public Citizen, Inc., Center for Science in the Public Interest, National Association of Consumer Advocates, and National Consumer Law Center, supporting appellants.

Bennett Rushkoff, Chief Public Advocacy Section, Office of the Attorney General, District of Columbia, with whom Peter J. Nickles, Attorney General, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and John L. Davie, Special Assistant Attorney General, for amicus curiae the District of Columbia, supporting appellees.

Paul D. Cullen, Sr., and Joyce L. Mayers, Washington, DC, filed a brief for ami-

cus curiae Brit A. Shaw, supporting appellants.

Hassan Zavareei, Melanie Williamson, Tracy D. Rezvani, Donald J. Enright, and Karen Marcus, Washington, DC, filed a brief for amicus curiae the National Consumers League and Individual Consumers Jarrod Beck, Keerthi Reddy, and Erin Galloway, supporting appellants.

Evan M. Tager, Archis A. Parasharami, Kevin Ranlett, Washington, DC, Scott M. Noveck, Robin S. Conrad, and Amar D. Sarwal, Washington, DC, filed a brief for amicus curiae the Chamber of Commerce of the United States, supporting appellees.

Theodore Hadzi–Antich, Buffalo, NY, and Deborah J. La Fetra, filed a brief for amicus curiae the Pacific Legal Foundation, supporting appellees.

Before WASHINGTON, Chief Judge, RUIZ, REID, GLICKMAN, KRAMER, FISHER, BLACKBURNE–RIGSBY, THOMPSON, and OBERLY, Associate Judges.

REID, Associate Judge:

In these consolidated cases[1] appellant Alan Grayson appeals the trial court's judgment granting appellees'[2] Super. Ct. Civ. R. 12(b) motion to dismiss his District of Columbia Consumer Protection Procedures Act ("CPPA") claims for unlawful trade practices.[3] These claims involve the unused balance on telephone calling cards (escheated telephone calling card prepayments), and Mr. Grayson describes his lawsuit as "a 'whistleblower' action" to recover funds belonging to the District. The trial court dismissed Mr. Grayson's CPPA claim on the ground that he lacked standing (Rule 12(b)(1)), and even if he suffered injury, his complaint failed to state a claim for which relief may be granted (Rule 12(b)(6)).

Appellant Paul M. Breakman appeals the trial court's judgment granting the Super. Ct. Civ. R. 12(b)(1) motion of appellee, AOL LLC ("AOL"), to dismiss his CPPA claim for unlawful trade practice on the ground that he does not have standing. He alleged, in essence, that AOL failed to disclose to its current and existing mem-

1. Panels of this court considered *Grayson* and *Breakman.* The en banc court vacated that part of the *Grayson* panel decision pertaining to the District of Columbia Consumer Protection Procedures Act. *See Grayson v. AT & T,* 989 A.2d 709 (D.C.2010). The major issue in *Grayson* concerned an alleged violation of the District of Columbia False Claims Act; that portion of the opinion was not vacated and remains at *Grayson v. AT & T Corp.,* 980 A.2d 1137 (D.C.2009) (*Grayson I* ). However, we vacated the entire unpublished memorandum opinion and judgment in *Breakman v. AOL,* 983 A.2d 1064, 2009 D.C.App. LEXIS 614 (D.C.2009); *Breakman* relied upon the CPPA portion of the *Grayson I* opinion.

In its Petition for Rehearing En Banc, filed on October 1, 2009, the *Grayson* appellees asserted, in part, that "by holding that Grayson can bring a claim under the CPPA even though he suffered no injury, the division's opinion rewrites this Court's standing jurisprudence." Petition, at 1. Because the peti-

tion focused on "a question of exceptional importance" and argued that "en banc consideration is necessary to secure or maintain uniformity of the court's decisions," *see* D.C.App. R. 35(a)(1) and (2) (2010), we granted the petition.

2. AT & T Corporation, MCI Worldcom Communications, Sprint Corporation, Verizon Communications Corporation, and the corporations' chief fiscal officers (collectively "appellees"). For purposes of Mr. Grayson's amended complaint, AT & T Corporation includes AT & T's division SmarTalk and AT & T Wireless Services, Inc; Sprint Corporation includes Sprint Communications Company Limited Partnership and Sprint International Communications Corporation; and Verizon Communications Corporation includes Verizon Washington, DC and Cellco Partnership d/b/a Verizon Wireless.

3. D.C.Code § 28–3904 *et seq.* (2009 Supp.).

bers the cheaper option for monthly Dial–Up ISP Service charged to new members.

Confronting us in both cases is a fundamental threshold issue of standing, which is not to be confounded with the question of whether appellants can prevail on the merits of their respective claims. Rather, we must determine whether the trial court properly dismissed these claims, in response to appellees' motions to dismiss, because appellants do not have standing to assert their CPPA claims. To answer that question, we focus first on the standing requirement in the District of Columbia. Second, we examine whether the Council of the District of Columbia intended to disturb or override this court's constitutional standing requirement. Third, we determine whether the factual allegations in Mr. Grayson's and Mr. Breakman's respective complaints are sufficient to enable them to survive a standing challenge on a motion to dismiss. Finally, because the trial court also dismissed Mr. Grayson's complaint under Super. Ct. Civ. R. 12(b)(6), we consider whether his complaint states a cause of action within the meaning of that rule.

We conclude that even though Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III, this court has followed consistently the constitutional standing requirement embodied in Article III. Thus, appellants must allege "some threatened or actual injury resulting from ... putatively illegal action"[4] in order for this court to assume jurisdiction. "The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' "[5]

We hold that the Council of the District of Columbia did not disturb or override our constitutional standing requirement in amending the CPPA in 2000; the words of the 2000 amendments, viewed in the context of the legislative and drafting history of these amendments, do not reveal an explicit intent of the Council to erase the constitutional standing requirement[6] to which this court has adhered during the past several decades.[7]

Furthermore, we hold that the trial court properly dismissed Mr. Breakman's complaint under Rule 12(b)(1) because he failed to plead sufficient facts showing that he meets the constitutional standing requirement, that is that he suffered an injury in fact or that he is entitled to lodge a representative action. And, we hold that Mr. Grayson has individual standing to seek injunctive or other relief under the principle that the "actual or threatened injury required by Art. III [of the Constitution] may exist solely by virtue of 'stat-

---

**4.** *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (citation omitted).

**5.** *Warth v. Seldin*, 422 U.S. 490, 500–01, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citing *Linda R.S., supra*, 410 U.S. at 617 n. 3, 93 S.Ct. 1146); *see also Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 731 (D.C.2000).

**6.** Our partially dissenting colleague, Judge Ruiz, argues that the Council intended to eliminate our constitutional standing requirement when it enacted the 2000 amendments to the CPPA. As we explain in Part IV(C) of this opinion, the majority believes that, in the absence of an explicit legislative pronouncement, it is not wise to infer the Council's intent to make such a striking change to our jurisprudence.

**7.** The Council decided to shift governmental enforcement responsibility from the Department of Consumer and Regulatory Affairs ("DCRA") to the then Office of the Corporation Counsel (now Office of the Attorney General, D.C. ("OAG")), and to add injunctions and disgorgement as tools to enforce the CPPA.

utes creating legal rights, the invasion of which creates standing.'" *Warth.*[8] However, we conclude that Mr. Grayson failed to allege legally viable claims under D.C.Code § 28–3904(a), (e), (f), (h), and (r).

Accordingly, we affirm the trial court's dismissal of Mr. Breakman's complaint; we disagree with its ruling as to Mr. Grayson's standing, but affirm its dismissal of Mr. Grayson's complaint under Super. Ct. Civ. R. 12(b)(6). We also amend and reissue *Grayson I* as an opinion covering only Mr. Grayson's claim under the District of Columbia False Claims Act ("FCA").

## I.

## FACTUAL SUMMARY

### Mr. Grayson's Amended Complaint and Mr. Breakman's Complaint

On March 26, 2004, Mr. Grayson filed an amended complaint in which he set forth a cause of action under the CPPA. He alleged the following, in part. He brought "this cause of action for the interests of himself and the general public." Paragraph 157. He described himself essentially as a businessman who had served in 1990 and 1991 as the President of a Fortune 500 international communications company, with over $1 billion in assets, which "operates in a variety of different markets, including prepaid calling cards."[9] "He has obtained and used prepaid calling cards in [the] District, the unused value of which the Defendants have failed to report and pay to the Mayor." Paragraph 6. Mr. Grayson alleges further that the unused

portion of a prepaid calling card is "breakage," and "[t]he defendants have been retaining breakage since 1992," in the amount of millions of dollars, instead of reporting and turning over the breakage to the Mayor of the District, as unclaimed property. Paragraphs 27–35. As of some time in 2003, "each of the[ ] Defendants held around $200,000 in communications prepayments received in 1999 from owners whose last known address was in the District"; these sums "had remained dormant during the statutory dormancy period," but "[t]he[ ] defendants failed to report and pay or deliver these deposits and advance payments to the Mayor by November 1, 2003." Paragraph 64. When "the amount of communications prepayments that the[ ] with District addresses in other years since 1997," are taken into consideration, "the total amount of communications prepayments that each of the[ ] [D]efendants had received from owners whose last known address was in the District that had remained dormant during the statutory dormancy period, as of June 30, 2003, exceeded $500,000 for Verizon, AT & T, MCI and Sprint." These sums were not reported or paid to the District, and "[a]s noted above, the ... Plaintiff has obtained and used prepaid calling cards in the District, the unused value of which the Defendants have failed to report and pay to the Mayor." Paragraph 32.

The complaint alleged that by their actions, the Defendants engaged in unlawful trade practices under D.C.Code § 28–3904 (2003).[10] Paragraph 165. "The Defendants

8. 422 U.S. at 500, 95 S.Ct. 2197.

9. As a "member of the International Prepaid Communications Association, the trade association for prepaid calling cards, [h]e edited one of the two leading industry surveys of prepaid communications." Paragraph 6.

10. Mr. Grayson alleged violations of D.C.Code § 28–3904(a), (e), (f), (h), and (r).

D.C.Code § 28–3904(a), (e), (f), (h), and (r) provide:

> It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:
> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients,

have engaged in the trade practice of soliciting and accepting communications prepayments, and then failing to pay or deliver to the Mayor the unused balances of prepaid calling cards ..., in violation of [the District of Columbia Unclaimed Property Act, in particular, D.C.Code § 41–119 (2003)]." Paragraph 164. Paragraphs 166 through 168 and 173 of Mr. Grayson's "Second Claim for Relief" specified that "[t]his practice is unlawful under D.C.Code § 28–3904 ... for several reasons":

166. § 28–3904(a) & (e). It is unlawful because the Defendants have represented to the owner that his or her prepayment equals the purchase price of the card. The Defendants have provided services whose price is less than the amount of prepayment. Thus the Defendants have represented that their services have characteristics, uses, benefits and quantities that they do not have. This violates D.C.Code § 28–3904(a) (2003). This also constitutes a representation of a material fact which has a tendency to mislead, which violates *id.* § 28–3904(e).

167. § 28–3904(h). This trade practice is unlawful because the Defendants have advertised and offered communications services whose price is equal to the amount of the prepayment, when the Defendants did not intend to provide services whose price is equal to the amount of the prepayment. In fact, the Defendants have provided services whose price is less than the amount of prepayment. Thus the Defendants have advertised or offered services without the intent to sell them (in cases where the calling card is never used) or without the intent to sell them as advertised or offered. This violates D.C.Code § 28–3904(h) (2003).

. . . .

168. § 28–3904(r). This trade practice is unlawful because pursuant to it, the Defendants retain property that, by law [D.C.Code § 41–119 (2003) and D.C.Code § 2–308.14 (2003)], must be paid or delivered to the District. The Defendants knew at the time of the sale that breakage is common, and their customers would be unable to receive sub-

uses, benefits, or quantities that they do not have;
. . . .
(e) misrepresent as to a material fact which has a tendency to mislead;
(f) fail to state a material fact if such failure tends to mislead;
. . . .
(h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;
. . . .
(r) make or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:
 (1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;
 (2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;
 (3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;
 (4) that the person contracted for or received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable; and
 (5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors[.]

stantial benefits from such breakage, unless the Defendants paid or delivered it to the District. Breakage leads to a gross disparity between the price of the prepaid calling card sold and the value of the services received. The Defendants have knowingly taken advantage of the inability of the customer reasonably to protect his interests because of age, physical or mental infirmities, ignorance, illiteracy, and inability to understand the language of the agreement, all of which lead to high breakage levels. This violates D.C.Code § 28–3904(r) (2003).

. . . .

173. § 28–3904(f). The failure to pay or deliver breakage to the District also is unlawful because the Defendants have failed to inform their customers that the Defendants will not pay or deliver breakage to the District. This is failure to state a material fact, and such failure tends to mislead the customers, in violation of D.C.Code § 28–3904(f) (2003).

Paragraphs 169 to 172 alleged the impact of defendants' unlawful trade practices on senior citizens and disabled persons. For example, Paragraph 172 declared that "senior citizens and disabled persons are substantially more vulnerable than other members of the public to the Defendants' conduct set forth above because of age, poor health or infirmity, impaired understanding, mobility or disability. They have actually suffered substantial economic damage from the Defendants' conduct." Paragraph 177 asserted that: "Verizon, AT & T, MCI and Sprint each have issued approximately 100,000 prepaid calling cards to persons whose last known address is in the District, which have remained dormant during the statutory period, but for which breakage has not been paid or delivered to the Mayor."

Mr. Breakman filed a complaint against AOL on January 23, 2008. He sought "to remedy AOL's unlawful trade practice of charging its current and past members more than double the price offered to new members for essentially the same services and failing to disclose to ... current and past members that essentially the same services are available at less than half the price they are being charged." Paragraph 1. He described himself only as "a resident of the District of Columbia," Paragraph 14, who was bringing his lawsuit "in a representative capacity on behalf of the interests of the general public ... for unlawful trade practices under the [CPPA]." Paragraph 5. He did not allege that he is an AOL member, or that he has any relationship to AOL. Rather, Mr. Breakman's complaint states that he 'is suing Defendant AOL for its trade practices in violation of the laws of the District of Columbia which have injured District of Columbia consumers who have paid and/or continue to pay AOL $23.90 to $25.90 a month for essentially the same Dial-up ISP Service new members get for $9.95 a month because AOL has failed to disclose to said consumers the material fact that essentially the same service is available for $9.95 per month.' Paragraph 12. He demanded "actual damages," "treble damages," "punitive damages," "[a]n injunction," and "[r]easonable attorneys' fees" against AOL "for each individual consumer."

### Appellees' Motions to Dismiss and the Rulings of the Trial Court

On March 20, 2007, appellees moved jointly to dismiss Mr. Grayson's claims, contending that his "complaint fails to state a claim under the [CPPA] because plaintiff cannot show that he or any other customer was injured." In an oral ruling, the trial court determined that Mr. Grayson lacked standing, noting that "to maintain a claim under the [CPPA], the plain-

tiff has to produce some evidence showing that there's some damage that he has suffered as a result of the unlawful trade practice." The court declared that Mr. Grayson "is a resident of the State of Florida and not the District of Columbia." Furthermore, the court reasoned that Mr. Grayson "has held the unclaimed property [his calling card] and still has possession of it according to his own complaint." "He has the property and he can use it at any time." Hence, "it is not abandoned property" and "there is no violation because he has the means and the opportunity to use the property at any time he chooses." The fact that Mr. Grayson's complaint alleges injuries to others and the District of Columbia under the CPPA is irrelevant; Mr. Grayson cannot bring a claim under the CPPA if "he himself has not suffered any injury." In addition, the trial court concluded that even if Mr. Grayson suffered an injury, the complaint alleges an injury that "belongs to the District of Columbia, and not to him" (that is, the failure of defendants "to notify the District of Columbia that they have been holding unclaimed property"). Consequently, Mr. Grayson "failed to ple[a]d the elements necessary to permit survival under a 12(b)(6) motion."

AOL lodged an amended June 27, 2008 motion to dismiss Mr. Breakman's CPPA claim under Super. Ct. Civ. R. 12(b)(1) and (6). AOL asserted that Mr. Breakman lacked standing to bring his claim, and stated, in part:

The Complaint ... is devoid of any allegations that [Mr.] Breakman is—or ever has been—a subscriber of AOL's dial-up services.... [Mr.] Breakman does not allege that he is part of the class that he represents.... He does not allege that AOL breached any duty to him, that he was mislead by AOL, or that he sustained any actual, consequential, or exemplary damages as a result of AOL's alleged conduct.

After reviewing the applicable CPPA statutory provisions, and case law governing standing, the trial court determined, in accordance with cited precedent, that "notwithstanding the [CPPA's] broad remedial provisions, ... a plaintiff must allege a personal injury in fact to have standing," but that "no reasonable juror could find plaintiff has sustained injury in fact."

## II.

### STANDARD OF REVIEW

 "Whether the trial court has subject matter jurisdiction is a question of law which this court reviews *de novo.*" [11] We also review "a dismissal for failure to state a claim *de novo.*" [12] "[W]e accept the allegations of the complaint as true, and construe all facts and inferences in favor of the plaintiff." [13] "Because '[o]ur rules reject the approach that pleading is a game of skill in which one misstep ... may be decisive to the outcome' and 'manifest a preference for resolution of disputes on the merits, not on technicalities of pleading,' we construe pleadings 'as to do substantial justice.'" [14] "The only issue on review of a

---

11. *Davis & Assocs. v. Williams,* 892 A.2d 1144, 1148 (D.C.2006) (citations omitted) A question of subject matter jurisdiction under Super. Ct. Civ. R. 12(b)(1) "concerns the court's authority to adjudicate the type of controversy presented by the case under consideration." *Id.* (citations omitted).

12. *Murray v. Wells Fargo Home Mortg.,* 953 A.2d 308, 316 (D.C.2008) (citations and internal quotation marks omitted).

13. *Solers, Inc. v. John Doe,* 977 A.2d 941, 947 (D.C.2009) (citing *In re Estate of Curseen,* 890 A.2d 191, 193 (D.C.2006)).

14. *Clampitt v. American Univ.,* 957 A.2d 23, 29 (D.C.2008) (quoting *Carter–Obayuwana v.*

dismissal made pursuant to Rule 12(b)(6) is the legal sufficiency of the complaint"; and "a complaint should not be dismissed because a court does not believe that a plaintiff will prevail on [his] claim." [15] "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." [16]

## III.

## THE STANDING DOCTRINE IN THE DISTRICT OF COLUMBIA

### A. *Introduction to the Standing Question*

▬▬▬ "Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." *Bochese v. Town of Ponce Inlet.*[17] This is a longstanding principle emphasized in federal case law since *Warth, supra,* where the Court unequivocally stated that Article III "standing in no way depends on the merits

of the plaintiff's contention that particular conduct is illegal." [18] Thus, the basic function of the standing inquiry is to serve as a threshold a plaintiff must surmount *before* a court will decide the merits question about the existence of a claimed legal right. If a plaintiff's factual allegations are sufficient to require a court to consider whether the plaintiff has a statutory (or otherwise legally protected right), then the Article III standing requirement has served its purpose; and the correctness of the plaintiff's legal theory—his understanding of the statute on which he relies—is a question that goes to the merits of the plaintiff's claim, not the plaintiff's standing to present it. Thus, during this threshold inquiry, "the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue." *United States v. Bearden.*[19] Federal Circuits routinely have approached standing as a question to be resolved prior to consideration of the merits of the case.[20]

---

*Howard Univ.,* 764 A.2d 779, 787 (D.C.2001)) (other citation omitted).

**15.** *Murray, supra,* 953 A.2d at 316 (D.C.2008) (citations omitted).

**16.** *Solers, supra,* 977 A.2d at 947 (citing *In re Estate of Curseen, supra,* 890 A.2d at 194). In interpreting our own Rule 12(b) we generally follow the Supreme Court and other federal courts' interpretation of the federal rule. However, this court has not yet decided whether it will follow the facial plausibility standard enunciated in *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

**17.** 405 F.3d 964, 974 (11th Cir.2005) (citations omitted); *see also Media Techns. Licensing, LLC v. The Upper Deck Co.,* 334 F.3d 1366, 1369 (Fed.Cir.2003) ("standing is a threshold question that must be resolved before proceeding to the merits of a case") (citations omitted).

**18.** *Warth,* 422 U.S. at 500, 95 S.Ct. 2197.

**19.** 328 F.3d 1011, 1013 (8th Cir.2003) (citations omitted). As *Warth* articulated this proposition: "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues .... [so far as Article III is concerned, *that is,*] whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498–99, 95 S.Ct. 2197.

**20.** *See Connecticut v. Am. Elec. Power Co., Inc.,* 582 F.3d 309, 339–40 (2d Cir.2009) ("In essence the question of standing is whether the litigant is entitled to have a court decide the merits of the dispute or of particular issues.") (internal quotation marks and citation omitted); *United States v. Sciarra,* 851 F.2d 621, 633 (3d Cir.1988); *Green v. City of Raleigh,* 523 F.3d 293, 299 (4th Cir.2008) ("[A] plaintiff's standing to bring a case does not depend upon his ultimate success on the merits underlying his case, because otherwise ev-

Yet, a court may be tempted to avoid the fundamental standing principle because of a conviction that a plaintiff cannot prevail on the merits of his complaint. The Ninth Circuit does not always follow the principle that standing must be considered independent of the merits, but it nevertheless has acknowledged this general principle:

> Quite frequently, and perhaps usually, the determination of the truth of the allegation of an injury in fact does not require an examination of the merits of the claim asserted. Under circumstances frequently existing, the issue of standing can be regarded as independent of the merits.

*American Civil Liberties Union v. Federal Commc'ns Comm'n*, 523 F.2d 1344, 1348 (9th Cir.1975). In *American Civil Liberties Union*, a case involving rules promulgated by the Federal Communications Commission, the court concluded that it was "confronted with circumstances in which the truth of the allegations of injury in fact can only be determined by examining the merits of the asserted claim." *Id.* Both the Tenth and the District of Columbia Circuits have grappled with this principle which recognizes overlap between the standing and merits inquiries. Both of these circuits have noted the inconsistency of its application, *see State of Utah v. Babbitt*, 137 F.3d 1193, 1207 n. 20 (10th Cir.1988) ("in cases when the standing inquiry overlaps with the merits of the plain-

tiff's claim, courts have been inconsistent in their willingness to resolve legal questions in determining standing") (citations omitted); *Taylor v. Federal Deposit Ins. Corp.*, 328 U.S.App.D.C. 52, 66, 132 F.3d 753, 767 (1997) ("The appropriate treatment of cases in which the standing inquiry overlaps with the merits so precisely is not entirely clear."). And, both of these circuits have endeavored to identify the type of case in which it is appropriate to apply this principle.

In *State of Utah v. Babbitt, supra*, plaintiffs in essence sought to participate in an inventory of public lands by the Department of the Interior. The court concluded that it had to determine whether the Federal Land Policy and Management Act (FLPMA) granted them a right to participate in the inventory before it could determine whether plaintiffs had standing to sue. It determined that the FLPMA did not grant them a right to participate in the inventory; therefore they had no standing. *Id.* at 1210. However, the court in *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1236 (10th Cir.2004), limited application of the overlap principle to situations in which plaintiffs lacked a legally protected interest and in which plaintiffs' claims had no foundation in law, and proceeded to determine that "plaintiffs have asserted protected legal interests necessary to establish standing." *Id.* at 1237.

---

ery unsuccessful plaintiff will have lacked standing in the first place") (internal quotation marks and citations omitted); *Covenant Media of South Carolina, LLC v. The City of North Charleston*, 493 F.3d 421, 429 (4th Cir. 2007) ("we must not confuse standing with the merits") (internal quotation marks and citation omitted); *Cole v. General Motors Corp.*, 484 F.3d 717, 723 (5th Cir.2007) ("The Supreme Court has made clear that when considering whether a plaintiff has Art. III standing, a federal court must assume ar-

guendo the merits of his or her legal claim.") (internal quotation marks and citation omitted); *Mississippi State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir.2008); *MainStreet Org. of Realtors v. Calumet City, Illinois*, 505 F.3d 742, 744 (7th Cir.2007) (stating "[w]e do not reach the merits of the suit" before considering the questions of constitutional and prudential standing); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1349 (11th Cir.2009).

The District of Columbia Circuit stated and apparently applied the overlap principle ("[I]f the plaintiff's claim has no foundation in law, he has no legally protected interest and thus no standing to sue")[21] in a 1997 case; the court concluded that plaintiff had no standing to bring her action under the Federal Advisory Committee Act. *Claybrook v. Slater*, 324 U.S.App. D.C.145, 148, 111 F.3d 904, 907 (1997). But, significantly, in a later case, the D.C. Circuit did not "read *Claybrook* to stand for the proposition, *contra Warth*, that we must evaluate the existence *vel non* of appellants' Second Amendment claim as a standing question." *Parker v. District of Columbia*, 375 U.S.App.D.C. 140, 148, 478 F.3d 370, 378 (2007). Furthermore, the court labeled the Ninth Circuit's reliance on the overlap principle as "doctrinally quite unsound."[22]

We believe that the D.C. Circuit's *Parker* opinion states the better view because it is faithful to the standing principle enunciated in *Warth*. It also is consistent with another Supreme Court case, *Public Citizen v. United States Dep't of Justice*.[23] There, plaintiffs sued to require the disclosure of information relating to an ABA committee's evaluations of prospective judicial nominees for the Department of Justice. They claimed that the disclosures were mandated by the Federal Advisory Committee Act (FACA), a law that requires governmental "advisory committees" (as defined) to make certain information public. The Court ultimately concluded that FACA was inapplicable to the ABA committee and therefore upheld the dismissal of the lawsuit on the merits because the plaintiffs had no statutory right to the information they sought. Nevertheless, as a threshold matter, the Court held that plaintiffs had standing to bring their lawsuit. Thus, at the point of the standing inquiry, the court did not look to whether the statutory right actually existed, but only whether plaintiffs alleged that they were denied information potentially covered by FACA.[24]

 We mention one other general principle applicable to the standing inqui-

---

**21.** *See also Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 898 (Fed.Cir.1989) ("We hold that appellants lack standing because the injury they assert is to a nonexistent right to continued importation of a Congressionally excluded product and is thus nonredressable.").

**22.** The court declared:

We note that the Ninth Circuit has recently dealt with a Second Amendment claim by first extensively analyzing that provision, determining that it does not provide an individual right, and only then, concluding that the plaintiff lacked standing to challenge a California statute restricting the possession, use, and transfer of assault weapons. We think such an approach is doctrinally unsound. The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim. We have repeatedly recognized that proposition.

375 U.S.App.D.C. at 146–47, 478 F.3d at 376–77 (citations omitted).

**23.** 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989).

**24.** In holding that plaintiffs had standing to bring their lawsuit, the Court analogized the case to FOIA claims:

As when an agency denies requests for information under the Freedom of Information Act, refusal to permit appellants to scrutinize the ABA Committee's activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue. Our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records. There is no reason for a different rule here.

491 U.S. at 449, 109 S.Ct. 2558 (citations omitted). A FOIA plaintiff's standing does not turn on whether the Act, as correctly construed, ultimately requires the government to disclose the agency records being sought.

ry. Standing analysis is different "at the successive stages of litigation."[25] Thus, the examination of standing in a case that comes to us on a motion to dismiss is not the same as in a case involving a summary judgment motion; the burden of proof is less demanding when the standing question is raised in a motion to dismiss.[26] Some federal circuits have determined that "a district court *cannot* decide disputed factual questions or make findings of credibility essential to the question of standing on the paper record alone but *must* hold an evidentiary hearing" (emphasis in original).[27] This practice is consistent with the Supreme Court's pronouncement in *Warth:*

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *E.g., Jenkins v. McKeithen,* 395 U.S. 411, 421–422 [89 S.Ct. 1843, 23 L.Ed.2d 404] (1969). At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.[28]

## B. Arguments of the Parties and Amici Regarding the District's Standing Doctrine

The parties and amici present diverse arguments regarding the standing doctrine in the District of Columbia. Mr. Grayson and Mr. Breakman contend that "the constitutional and prudential standing principles imposed by Article III are not mandatory with respect to the District's courts." But appellees argue that before this court decides the merits of a case "the constitutional requirement of a case or controversy and the prudential prerequisites of standing must be satisfied." The Legal Aid Society notes the different ways in which this court has articulated its "justiciability principles (such as standing, mootness, and ripeness)" and urges the court "to recognize explicitly that the D.C. courts are not subject to the same justiciability principles that constrain the judicial power of Article III courts." The District asserts that the conclusion, articulated in some of our cases, that we are "not governed by Article III limitations[,] is well-supported by Supreme Court holdings that Congress has vested the District's courts" with the same type of jurisdiction that state courts exercise, and that we should not read D.C.Code § 11–705, which refers to cases and controversies, "to incorporate all of the jurisprudence relating to those words in Article III of the Constitution."[29]

**25.** *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).

**26.** *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130; see discussion *infra.*

**27.** *Bischoff v. Osceola County, Florida,* 222 F.3d 874, 879 (11th Cir.2000) (citation omitted); *see also* other circuit authorities referenced in *Bischoff.*

**28.** 422 U.S. at 501–02, 95 S.Ct. 2197. *Accord Haase v. Sessions,* 266 U.S.App.D.C. 325, 329, 835 F.2d 902, 906 (1987) ("In [Fed.R.Civ.P.] 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.' ") (citations omitted).

**29.** In her separate statement, Judge Ruiz discusses D.C.Code § 11–705(b) and the constitutional "case or controversy" limitation. Since we conclude that the CPPA retains our injury-in-fact standing requirement, we do not need to address and we take no position on whether Congress by statute has imposed Article III's standing requirement on the local

To address these contentions, we first provide historical insight into the evolution of the standing doctrine in the District of Columbia. We then discuss the incorporation into our jurisprudence of standing concepts from federal case law.

### C. *Historical Background*

Historically, we began to articulate our standing principles as the District government transitioned from the Federal Administrative Procedure Act ("FAPA") to the District of Columbia Administrative Procedure Act ("DCAPA"). Relying on the legislative history of the DCAPA, we adopted the identical three-part test for standing followed in the federal courts under the FAPA.[30] As we confronted the standing issue in non-APA cases, after Congress enacted the District of Columbia Court Reform and Criminal Procedure Act of 1970 ("Court Reform Act"),[31] we took into consideration the fact that we are an Article I court under the Constitution, rather than an Article III court; and in one of our early cases following the adoption of the Court Reform Act, we said:

> The requirement that a party have "standing" to invoke the judicial power of the United States is designed to enforce the mandate of Article III of the Constitution that federal courts have ju-

risdiction only in "cases" and "controversies", . . . although Article III is not the exclusive source of the requirement. . . . In *Palmore v. United States*, the Supreme Court recently affirmed the view that the courts of local jurisdiction of the District of Columbia, established by Congress pursuant to Article I, are not bound by the requirements of Article III.

> Our jurisdiction thus extends as far as Congress has granted it. Without, however, examining the limits of this grant, this court has followed the principles of standing, justiciability and mootness to promote sound judicial economy and has recognized that an adversary system can best adjudicate real, not abstract, conflicts. *Basiliko* [, *supra* ], 283 A.2d [at] 818; *Atkins v. United States*, 283 A.2d 204, 205 (D.C.1971).

*District of Columbia v. Walters.*[32]

### D. *Incorporation of Standing Principles from Federal Court Cases*

Even though we are an Article I court, we have followed Supreme Court developments in constitutional standing jurisprudence with respect to "whether the plaintiff has made out a case or controversy between him[/her] and the defendant with-

---

courts of the District of Columbia through D.C.Code § 11–705(b).

**30.** *See Basiliko v. District of Columbia*, 283 A.2d 816, 818 (D.C.1971) (citing *Ballerina Pen Co. v. Kunzig*, 140 U.S.App.D.C. 98, 433 F.2d 1204 (D.C.Cir.1970)) (other citations omitted). The FAPA test was adopted in *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and consistent with our adherence to FAPA standing principles, we added a fourth prong after the Supreme Court decided *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 42–46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). We have continued to follow the FAPA test in our DCAPA cases. *See, for exam-*

*ple, Miller v. District of Columbia Bd. of Zoning Adjustment*, 948 A.2d 571, 574–75 (D.C. 2008) (After articulating the test, we decided to assume standing because the proper resolution of the merits was clear); *Dupont Circle Citizens Ass'n v. Barry*, 455 A.2d 417, 421 (D.C.1983); *Lee v. District of Columbia Bd. of Appeals and Review*, 423 A.2d 210, 215–17 (D.C.1980).

**31.** D.C.Code § 11–101, *et seq.*

**32.** 319 A.2d 332, 337 n. 13 (D.C.1974) (other citations omitted). *See also Key v. Doyle*, 434 U.S. 59, 62–68, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977) (discussing *Palmore* and "the analogy of the local D.C. courts to state courts").

in the meaning of Article III," and we generally have applied prudential limitations on the exercise of our jurisdiction.[33] We also have recognized that "when Congress intends to extend standing to the full limit of Article III, the sole requirement for standing ... [is a] minima of injury in fact, [and under this circumstance,] courts lack the authority to create prudential barriers to standing."[34] We often cite *Warth, supra. Warth* articulated the "minimum constitutional mandate"[35] as follows:

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr,* 369 U.S. 186, 204 [82 S.Ct. 691, 7

L.Ed.2d 663] (1962). The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action...." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 [93 S.Ct. 1146, 35 L.Ed.2d 536] (1973). *See Data Processing Service v. Camp,* 397 U.S. 150, 151–154 [90 S.Ct. 827, 25 L.Ed.2d 184] (1970).[36]

One manifestation of injury in fact is the violation of legal rights created by statute. As *Warth* declared:

> The actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing...." *See Linda R.S. v. Richard D., supra,* at 617 n. 3 [93 S.Ct. 1146]; *Sierra Club v. Morton,* 405 U.S. 727, 732 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972). .... Moreover, Congress may grant an express right of action to persons who otherwise would

---

33. *Consumer Fed'n of America v. Upjohn Co.,* 346 A.2d 725, 727 (D.C.1975).

34. *Executive Sandwich Shoppe, Inc., supra,* 749 A.2d at 731 (internal quotation marks omitted).

35. 422 U.S. at 499, 95 S.Ct. 2197.

36. 422 U.S. at 498–99, 95 S.Ct. 2197. *Lujan, supra,* elaborated on this "minimum constitutional mandate":

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, see [*Allen v. Wright,* 468 U.S. 737,] 756 [104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)]; *Warth* [ ], 422 U.S. [at] 508 [95

S.Ct. 2197]; *Sierra Club v. Morton,* 405 U.S. 727, 740–41, n. 16 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972); and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore* [*v. Arkansas,* 495 U.S. 149,] 155 [110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)] (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 102 [103 S.Ct. 1660, 75 L.Ed.2d 675] (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 [96 S.Ct. 1917, 48 L.Ed.2d 450] (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.,* at 38, 43 [96 S.Ct. 1917].

*Id.* at 560–61, 112 S.Ct. 2130.

be barred by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants. *E.g., United States v. SCRAP,* 412 U.S. 669 [93 S.Ct. 2405, 37 L.Ed.2d 254] (1973). But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim. *E.g., Sierra Club v. Morton, supra,* at 737 [92 S.Ct. 1361]; *FCC v. Sanders* [*Bros.*] *Radio Station,* 309 U.S. 470, 477 [60 S.Ct. 693, 84 L.Ed. 869] (1940).[37]

Through the years our cases consistently have followed the constitutional minimum of standing as articulated in *Warth* and *Lujan.*[38] And in *Executive Sandwich Shoppe, Inc., supra,* we recognized that a plaintiff may be required to meet only the minimum constitutional requirement to gain standing to bring his action. After mentioning the decisions in *Allen v. Wright, supra,* and *Warth, supra,* we said:

Constitutional standing under Article III requires the plaintiff to "allege personal injury fairly traceable to the defendant's unlawful conduct and likely to be redressed by the requested relief." *Wright,* 468 U.S. at 751 [104 S.Ct. 3315]. Out of prudential concerns, "standing doctrine embraces several judicially self-imposed limits on the exercise ... of jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights ... and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* However, when Congress intends to extend standing to the full limit of Article III, the "sole requirement for standing ... [is a] minima of injury in fact." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Thus, when standing is permissible to the limit of Article III, courts "lack the authority to create prudential barriers to standing." *Id.*[39]

The next question we confront is whether in enacting the 2000 amendments to the

---

**37.** 422 U.S. at 500–01, 95 S.Ct. 2197.

**38.** The parties and *amici* point out that there have been variations in our articulation of standing requirements. *See Riverside Hosp. v. District of Columbia Dep't of Health,* 944 A.2d 1098, 1103–04 (D.C.2008); *Friends of Tilden Park, Inc. v. District of Columbia and Clark Realty Capital, LLC,* 806 A.2d 1201, 1206–07 (D.C.2002); *Randolph v. ING Life Ins. and Annuity Co.,* 973 A.2d 702, 706 n. 4 (D.C. 2009); *Fisher v. Government Emps. Ins. Co.,* 762 A.2d 35, 38 n. 7 (D.C.2000). Regardless of the words used in different cases to articulate our standing requirement, however, we have said since the creation of the current District of Columbia court system that we will follow the federal constitutional standing requirement. The one area in which we have not followed strictly federal justiciability requirements concerns the doctrine of mootness. *See, for example, Brown v. United States,* 900 A.2d 184, 193 (D.C.2006) (reaching the merits even though appellant had "long ago" completed his jail sentence); *Francis v. Recycling Solutions, Inc.,* 695 A.2d 63, 68 (D.C.1997) (stating that we "will not normally decide questions which have become moot" but concluding that the "case remains a live controversy" even though contract had been cancelled); *Atchison v. District of Columbia,* 585 A.2d 150, 153 (D.C.1991) ("[T]he decisions of the Supreme Court on the issue of mootness, which arise in the context of the case or controversy requirement of Article III of the Constitution, are not binding on this court.") (internal quotation marks and citation omitted).

**39.** 749 A.2d at 730–31.

CPPA, the Council intended to disturb or override the constitutional doctrine of standing which we have applied for decades.

## IV.

## THE YEAR 2000 CPPA AMENDMENTS

At issue in these cases is whether in amending D.C.Code § 28–3905(k) in 2000, the Council intended to eliminate the constitutional standing requirement to which this court has adhered. D.C.Code § 28–3905(k) (2001) now specifies:

(k)(1) A person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia and may recover or obtain the following remedies:

(A) treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;

(B) reasonable attorney's fees;

(C) punitive damages;

(D) an injunction against the use of the unlawful trade practice;

(E) in representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice; or

(F) any other relief which the court deems proper.

(2) The remedies or penalties provided by this chapter are cumulative and in addition to other remedies or penalties provided by law. Nothing in this chapter shall prevent any person who is injured by a trade practice in violation of a law of the District of Columbia within the jurisdiction of the Department from exercising any right or seeking any remedy to which the person might be entitled or from filing any complaint with any other agency.

Prior to the amendments in 2000, D.C.Code § 28–3905(k) (1981) (1996 Repl.) provided:

(1) Any consumer who suffers any damage as a result of the use or employment by any person of a trade practice in violation of a law of the District of Columbia within the jurisdiction of the Department may bring an action in the Superior Court of the District of Columbia to recover or obtain any of the following:

(A) treble damages;

(B) reasonable attorneys' fees;

(C) punitive damages;

(D) Any other relief which the court deems proper.

(2) Nothing in this chapter shall prevent any person who is injured by a trade practice in violation of a law of the District of Columbia within the jurisdiction of the Department from exercising any right or seeking any remedy to which the person might be entitled or from filing any complaint with any other agency.

The amendment to § 28–3905(k)(1) in part resulted in elimination of the language "[a]ny consumer who suffers damage"[40] and the insertion instead of "[a] person, whether acting in the interests of itself, its members, or the general public . . . seeking relief from . . . ." The Council also added to subsection (k)(1) additional remedies. The amendment to subsection (k)(2) speci-

---

40. *See Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 203–04 (D.C.1991) (referencing and commenting on this pre-amendment language).

fied the cumulative nature of the remedies in the CPPA statute.

### A. Arguments of the Parties and Amici Regarding the Council's Intent

The parties, and *amici curiae* who presented oral argument, disagree on how to determine the Council's intent in enacting amendments to the CPPA. They also reach different conclusions as to whether the Council intended to eliminate this court's constitutional standing requirement. Appellants contend that "the issue for this [c]ourt is a simple question of statutory construction of the meaning of the 2000 amendments to the CPPA," and that when it enacted those amendments, "the Council [ ] deliberately and specifically eliminated the requirements of injury in fact and causation in representative actions." [41] Appellees reject what they describe as "the plain language" argument of appellants; they argue that "there is *no language* in the amended statute that states that the Council intended to jettison well-settled District law and allow—for the first time ever—a plaintiff to bring an action without alleging injury-in-fact" (emphasis in original). In its *amici curiae* brief supporting appellants, the Legal Aid Society of the District of Columbia asserts:

> [W]hatever prudential limits this [c]ourt may choose to adopt for lawsuits asserting common-law or constitutional causes of action, a legislature may override such prudential limits by granting an express right of action to persons who otherwise would be barred by prudential standing rules. The [ ] Council did precisely that when it enacted the 2000 amendments to the CPPA: After

the amendments, a person may bring a CPPA action on behalf of the general public, whether or not that person has suffered an injury.

But the District of Columbia, as *amicus curiae* in support of appellees, declares:

> There is nothing explicit, either in the CPPA as amended or in the legislative history of the CPPA amendments, that demonstrates an affirmative intent by the Council to displace the usual standing requirement that a plaintiff—unless asserting associational standing on behalf of its members—be either injured or threatened with imminent injury. Although the Division [of this court in the panel's *Grayson* decision] had a reasonable basis to conclude that the CPPA as amended does not incorporate that requirement, the *en banc* [c]ourt should not rule, absent clearer evidence, that such was the Council's intent.

We next set forth the principles of statutory construction that will guide our analysis, and then we examine the Council's intent in enacting the year 2000 CPPA amendments.

### B. Principles of Statutory Construction

In interpreting statutes, judicial tribunals seek to discern the intent of the legislature and, as necessary, whether that intent is consistent with fundamental principles of law: "In construing a statute the primary rule is to ascertain and give effect to legislative intent and to give legislative words their natural meaning; [s]hould effort be made to broaden the meaning of statutory language by mere

---

41. Appellants rely on the federal District Court's decision in *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1 (D.D.C.2002), to buttress their contention that, as amended, the current CPPA does not require an injury-in-fact. But the decision of the District Court is not binding on us. The *Wells* court observed that "[t]he [CPPA] as amended eliminates [the] requirements of injury in fact and causation," but that observation was without the advantage of full briefing on the legislative and drafting history of the amendments. *Id.* at 8.

inference or surmise or speculation, we might well defeat true [legislative] intent." [42] The words of a statute are "a primary index but not the sole index to legislative intent"; the words "cannot prevail over strong contrary indications in the legislative history...." [43] And, "[words] are inexact tools at best and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how clear the words may appear on superficial examination." [44] In that regard, we "presume[ ] [that the legislature] acted rationally and reasonably," and we "eschew interpretations that lead to unreasonable results." [45] "Statutory interpretation is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." [46] "A basic principle [of statutory interpretation] is that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." [47]

## C. The Council's Intent

 After reviewing the issue presented to us—the Council's intent regarding this court's constitutional standing requirement and its 2000 amendments to the CPPA—and the widely varying interpretations of those amendments presented by the parties and the cited *amici*, we are persuaded that the 2000 amendments, viewed in the context of the legislative and drafting history of those amendments, do not reveal an explicit intent of the Council to erase the constitutional standing requirement to which this court has adhered during the past several decades. The words of the statutory provisions alone are "inexact tools" for ascertaining the Council's intent; this is a situation requiring "resort to explanatory legislative history." We can gain an understanding of the meaning of the 2000 amendments by examining both the internal and external context [48] of the amended statute, that is, the words and the legislative and drafting history of the amendments. [49]

**42.** *Banks v. United States*, 359 A.2d 8, 10 (D.C.1976) (quoting *General Motors Acceptance Corp. v. One 1962 Chevrolet Sedan*, 191 A.2d 140, 142 (D.C.1963)).

**43.** *Citizens Ass'n of Georgetown v. Zoning Comm'n of the District of Columbia*, 392 A.2d 1027, 1033 (D.C.1978) (quoting *Lange v. United States*, 143 U.S.App.D.C. 305, 307–08, 443 F.2d 720, 722–23 (1971) (footnotes omitted)); *see also Columbia Plaza Tenants Ass'n v. Columbia Plaza L.P.*, 869 A.2d 329, 332 (D.C. 2005) (Words "are to be given a sensible construction and one that would not work an obvious injustice.") (citations and internal quotations omitted).

**44.** *Id.* (quoting *Harrison v. Northern Trust Co.*, 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407 (1943) (internal quotation marks omitted)).

**45.** *In re C.L.M.*, 766 A.2d 992, 996 (D.C.2001); *see also Jeffrey v. United States*, 892 A.2d 1122, 1128 (D.C.2006) (We are "requir[ed] [to] remain[ ] more faithful to the purpose

than the word.") (citations and internal quotation marks omitted).

**46.** *Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939, 946 (D.C.2003) (quoting *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993)).

**47.** *Tangoren v. Stephenson*, 977 A.2d 357, 360 n. 12 (D.C.2009) (quoting *Thomas v. District of Columbia Dep't of Employment Servs.*, 547 A.2d 1034, 1037 (D.C.1988)).

**48.** For a discussion of internal and external context in statutory interpretation, *see generally* WILLIAM D. POPKIN, MATERIALS ON LEGISLATION: POLITICAL LANGUAGE AND THE POLITICAL PROCESS (3d ed.2001).

**49.** *Cass v. United States*, 417 U.S. 72, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974), required the interpretation of a statutory provision pertaining to the entitlement of armed forces reserve officers, released involuntarily from active

The starting point for our understanding of the Council's intent is the essential purpose of the CPPA, which has remained unchanged throughout the CPPA's history. The CPPA was enacted to "assure that a just mechanism exists to remedy all improper trade practices."[50] While the CPPA's essential purpose has remained constant through the years, funding and fiscal problems compelled a change in the enforcement scheme.[51] The nature of that change also is critical to our determination of the legislative intent regarding the 2000 amendments.

According to the legislative history of the CPPA, the District of Columbia Office of Consumer Protection, the legislative predecessor of the District's Department of Consumer and Regulatory Affairs ("DCRA"), initially had the responsibility of evaluating consumer complaints against vendors and taking legal action on behalf of the consumers.[52] In addition, consumer victims of unlawful trade practices could file a lawsuit directly against an allegedly offending merchant.[53] When DCRA was established, the functions of the Office of Consumer Protection were transferred to DCRA.[54] DCRA created an Office of Compliance to investigate consumer complaints about unlawful trade practices, and to refer appropriate complaints to other agencies for prosecution.[55] The District experi-

duty, to a readjustment payment. Petitioners argued that the meaning of the statute was clear and "that resort to legislative history [was] unnecessary and improper." *Id.* at 76, 94 S.Ct. 2167. The Supreme Court's response to petitioners' argument is instructive:

> The [statutory] provision [at issue] is arguably subject to the interpretation given it by petitioners, but did Congress intend that provision to override its explicit requirement of "at least" five years of service? We think the answer to that question is sufficiently doubtful to warrant our resort to extrinsic aids to determine the intent of Congress, which, of course, is the controlling consideration in resolving the issue before us. Moreover, the Court has previously stated that "when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination,'" *United States v. American Trucking Assns., Inc.,* 310 U.S. 534, 543–544 [60 S.Ct. 1059, 84 L.Ed. 1345] (1940); *Harrison* [, *supra,*] 317 U.S. [at] 479 [63 S.Ct. 361]. Such aid is available in this case and we decline to ignore the clearly relevant history of [the statutory provision]. *Id.* at 77, 94 S.Ct. 2167. *See also District of Columbia v. Edison Place,* 892 A.2d 1108 (D.C.2006).

50. D.C.Code § 28–3901(b)(1) (1996 Repl.). The only change that the Council made to this subsection in 2000 was to add the words, "and deter the continuing use of such practices." D.C.Code § 28–3901(b)(1) (2000).

51. A secondary purpose of the CPPA is to "promote, through effective enforcement, fair business practices throughout the community." The 2000 amendments made no change in this secondary purpose. *See* D.C.Code § 28–3901(b)(2) (2001).

52. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS, Report on Bill 1–253, "the District of Columbia Consumer Protection Procedures Act," March 24, 1976 ("the 1976 Report"), at 10–11, 15–17.

53. The 1976 Report declares, in part, that section 6(k)(1) of the CPPA "permits a consumer to go directly to court when injured by a trade practice, without going through the office first"; and section 6(k)(2) "states that an injured consumer may bring another type of action or file a complaint with another agency if he or she deems that to be appropriate." *Id.* at 23.

54. *See* Reorganization Plan No. 1 of 1983, District of Columbia Department of Consumer and Regulatory Affairs, D.C.Code, vol. 1 (1991 Repl.), at 316–19. The Reorganization Plan was transmitted to the Council on January 3, 1983, and it became effective on March 31, 1983.

55. The Council did not seek to codify the change from the Office of Consumer Protection to DCRA and its Office of Compliance

enced severe fiscal problems in 1995, and as a consequence, the Council suspended DCRA's consumer protection enforcement role, until October 1, 1998, by eliminating its funding, in order to "balance the District's general fund operating budget and to alleviate cash shortfalls." [56]

The Antitrust, Trade Regulation and Consumer Affairs Section of the District of Columbia Bar ("D.C. Bar Section") recommended changes in the consumer protection enforcement mechanism in April 1999.[57] The D.C. Bar Report served as a road map for the Council's 2000 amendments to the CPPA; there were three major recommendations: (1) "extend to the Office of the Corporation Counsel [now the Office of the Attorney General, District of Columbia] a range of enforcement authority comparable to that exercised previously by DCRA . . . ."; (2) "provide public interest organizations and private attorneys the ability to seek injunctive relief and disgorgement of ill-gotten gains in the public interest"; and (3) "reestablish a single point of entry for consumer complaints." [58] These recommendations formed the nucleus of proposed legislation developed by the legislative committee of the Public–Private Working Group on Consumer Affairs.[59] The D.C. Bar Section sent the proposed legislation to the Council's Committee on Consumer and Regulatory Affairs.[60]

In explaining the rationale for the proposed amendments to D.C.Code § 28–3905(k)(1),[61] the drafters appeared to focus on preventive enforcement through injunctive action, and disgorgement of unlawful

---

until late 1990. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, Report on Bill 8–111, the "District of Columbia Consumer Protection Procedures Amendment Act of 1989" and 8–271, the "Consumer Protection Procedures Act Amendment Act of 1989," October 23, 1990. The legislation, D.C. Law 8–234, took effect on March 8, 1991.

**56.** COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE OF THE WHOLE, Report on Bill 11–218, "Omnibus Budget Support Act of 1995," April 18, 1995, at 1, 19.

**57.** Carl Messineo, *et al.*, Consumer Protection in the District of Columbia Following the Suspension of the Consumer Protection Procedures Act: Report With Recommendations by the Antitrust, Trade Regulation, and Consumer Affairs Section of the D.C. Bar, April 1999 ("D.C. Bar Report"), at 1.

**58.** D.C. Bar Report at 9–12.

**59.** The Working Group consisted of "representatives from [the Office of the Corporation Counsel,] DCRA, the non-profit sector and the private bar." Letter from Mara Verheyden Hilliard (Partnership for Civil Justice, Inc.) to Bennett Rushkoff (Office of the Corporation Counsel), April 30, 1999.

**60.** Letter from Mara Verheyden Hilliard to the Committee on Consumer and Regulatory Affairs, March 29, 2000.

**61.** The drafters proposed that D.C.Code § 28–3905(k)(1) be changed to read:

Actions for relief under this chapter seeking remedy for the use or employment by any person of a trade practice in violation of a law of the District of Columbia may be brought by any person, whether acting for the interests of itself, its members, or the general public, in the Superior Court of the District of Columbia to recover or obtain any of the following:

(a) treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;

(b) reasonable attorney's fees;

(c) punitive damages; and

(d) an injunction against the continuing use of an unlawful trade practice;

(e) in representative actions, in addition to the relief provided above, such orders or judgments as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unlawful trade practice; and

(f) any other relief which the court deems proper.

Attachment to Letter from Mara Verheyden Hilliard to Bennett Rushkoff, *supra*, at 2.

gains by merchants. They envisioned government coordination with public interest organizations as an additional funding source ("private and donated funds") for consumer protection enforcement. The drafters' explanatory rationale stated, in part:

> Currently it is not possible to bring a consumer action to stop illegal conduct until after a victim suffers injury. This amendment allows, for example, an organization that monitors fraud against the elderly to petition the court to stop a misleading and a fraudulent mailing in the public interest without waiting for a senior citizen to lose his or her life savings. . . .

> This will also allow the government to coordinate with the non-profit and private sectors more efficiently. . . . Public interest organizations will be able to bring additional resources to consumer protection enforcement in the District, contributing private and donated funds that will advance public priorities without causing the expenditure of additional government resources.

> Proposed subsections (d) and (e) provide for injunctive relief and disgorgement of ill-gotten gain in representative actions, respectively. Although, injunctive relief presumably is available under current law pursuant to § 28–3905(k)(1)(e), this amendment codifies this presumption to eliminate any statutory ambiguity. Disgorgement has been recognized as an essential element of consumer protection law.[62]

The drafters' rationale for the changes to D.C.Code § 28–3905(k)(1) referenced the California consumer protection law generally, first by citing to "California Business and Professions Code Sections 17200 *et seq.*," without any explicit reference to the California statutory provision [§ 17535] that reportedly eliminated the constitutional standing or injury in fact requirement;[63] and by citing *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 547, 833 P.2d 545 (1992) (en banc) (quoting *Fletcher v. Security Pac. Nat'l Bank*, 23 Cal.3d 442, 451, 153 Cal.Rptr. 28, 591 P.2d 51 (1979)).[64] Another California case was cited by the drafters in the rationale for part of the recommended amendment to D.C.Code § 28–3901(b); that recommended amendment is now implicitly part of D.C.Code § 28–3905(k)(1).[65] Signifi-

---

**62.** Attachment to Letter from Mara Verheyden Hilliard to Bennett Ruskoff, at 3.

**63.** In 2004, as a result of a referendum, section 17535 was amended by replacing the language, "acting for the interests of itself, its members or the general public," with the following language: "who has suffered injury in fact and has lost money or property as a result of a violation of this chapter." *See* notes to Cal. Bus. & Prof.Code § 17535. Section 17203 of the Cal. Bus. & Prof.Code now provides, in part: "Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204"; and section 17204 states, in part: "Actions for relief pursuant to this chapter shall be prosecuted . . . by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." *See also Buckland v. Threshold Enters., Ltd.*, 155 Cal.App.4th 798, 66 Cal.Rptr.3d 543, 552–53 (2007) (explaining the reasons for the change in the statutory provisions).

**64.** The cited excerpts from these cases addressed the remedies of disgorgement and restitution.

**65.** The Council chose not to include recommended disgorgement language in the CPPA purpose provision, but to add language to D.C.Code § 28–3905(D) and (E) which could include the disgorgement remedy and injunctive relief. The legislative committee of the Working Group recommended that D.C.Code § 28–3901(b) be amended to read:

> The purposes of this chapter are to:
> (1) assure that a just mechanism exists to remedy all improper trade practices and

cantly, we interpret the statutory language, "seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia," as consistent with our long-enduring constitutional standing requirement since we discern no clear or explicit intent on the part of the Council to disturb or override that requirement.

Both the Council's Committee on Consumer and Regulatory Affairs and the Committee of the Whole considered the proposed legislation drafted in response to the D.C. Bar Report. While the Committee on Consumer and Regulatory Affairs adopted many of the provisions recommended by the D.C. Bar Section, the Committee made several changes to the language of the proposed legislation prior to submitting it for consideration by the Committee of the Whole.[66] The proposed CPPA legislation was folded into proposed

comprehensive budget support legislation, which covered a wide range of subjects, including victims of violent crime compensation, historic preservation reorganization, public school matters, rental housing, water and sewer repairs, and Medicaid reimbursement.[67] The 2000 budget act continued the "defunding" of DCRA consumer protection under the CPPA.

The key CPPA amendments in the proposed budget support act were the following:

(1) D.C.Code § 28–3901(c): "This chapter shall be construed and applied liberally to promote its purpose."

(2) Amendments to D.C.Code §§ 28–3905(k)(1) and (2).

(3) Amendments to D.C.Code § 28–3909 to reflect the consumer protection enforcement authority of the Office of the Corporation Counsel.[68]

---

deter the continuing use of such practices by, among other things, requiring businesses to disgorge unjust gains obtained by the use of such acts or practices, and by assessing damages and civil penalties. (Recommended additional language underlined). Only the words "and deter the continuing use of such practices" were included in the amendment to § 28–3901(b). The drafters' rationale for including the omitted disgorgement language included a citation to *Bank of the West* and *Fletcher.*

**66.** The D.C. Bar Section's proposed § 28–3905(k)(1) began with:

Actions for relief under this chapter seeking remedy for the use or employment by any person of a trade practice in violation of a law of the District of Columbia may be brought by any person, whether acting for the interests of itself, its members, or the general public....

Attachment to Letter from Mara Vanderheyden–Hilliard to Bennett Rushkoff, at 2. Instead of adopting the recommended language verbatim, however, the Council modified § 28–3905(k)(1) to read in pertinent part:

A person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Colum-

bia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia....

**67.** *See* Council of the District of Columbia, Committee on Consumer and Regulatory Affairs, Report on Bill 13–679, "Fiscal Year 2000 Budget Support Act of 2000," April 26, 2000 ("the Ambrose Committee Report"); Council of the District of Columbia, Committee of the Whole, Report on Bill 13–679, "Fiscal Year 2001 Budget Support Act of 2000," May 19, 2000 ("the Cropp Committee Report").

**68.** D.C.Code § 28–3909 was amended by designating the existing provision as subsection (a) and by adding new subsections (b) and (c):

(a) Notwithstanding any provision of law to the contrary, if the Attorney General has reason to believe that any person is using or intends to use any method, act, or practice in violation of section 28–3803, 28–3805, 28–3807, 28–3810, 28–3811, 28–3812, 28–3814, 28–3817, 28–3818, 28–3819, or 28–3904, and if it is in the public interest, the Attorney General, in the name of the District of Columbia, may petition the Superior Court of the District of Columbia to issue a temporary or permanent injunction against

Neither the Ambrose Committee Report nor the Cropp Committee Report made any mention of this court's constitutional standing requirement. The Ambrose Committee Report generally repeated the explanatory rationale set forth in the draft legislation transmitted to OCC on April 30, 1999.[69] The Cropp Committee Report basically summarized the proposed CPPA amendments and included a fiscal impact statement. Tapes of the hearings for the first and second readings of the budget support act reveal no discussion of the CPPA amendments or the court's constitutional standing requirement.[70]

In sum, our review of the legislative and drafting history of the 2000 CPPA amendments convinces us that the Council expressed no intent to override or disturb this court's constitutional standing requirement; and that in light of that history, focusing solely on statutory words, *cf. Beard, supra,* which at first blush may appear to be crystal clear, would produce the unintended result of overturning our long-enduring legal principles governing constitutional standing; it also would open our courts to any person from anywhere who decides to lodge a complaint labeled as a "representative action" under the CPPA, even though that person has suffered no injury-in-fact related to a District of Columbia merchant's unlawful trade practice.[71] Elimination of our constitution-

the use of the method, act, or practice. In any action under this section, the Attorney General shall not be required to prove damages and the injunction shall be issued without bond. *The Attorney General may recover restitution for property lost or damages suffered by consumers as a consequence of the unlawful act or practice.* (Emphasis added)

(b) In addition, in an action under this section, the Attorney General may recover a civil penalty of not more than $1,000 for each violation, the costs of the action, and reasonable attorney's fees.

(c) The Attorney General may also:

(1) represent the interests of consumers before administrative and regulatory agencies and legislative bodies;

(2) assist, advise, and cooperate with private, local, and federal agencies and officials to protect and promote the interests of consumers;

(3) assist, develop, and conduct programs of consumer education and information through public hearings, meetings, publications, or other materials prepared for distribution to consumers;

(4) undertake activities to encourage local business and industry to maintain high standards of honesty, fair business practices, and public responsibility in the production, promotion, and sale of consumer goods and services and in the extension of consumer credit;

(5) perform other functions and duties which are consistent with the purposes or provisions of this chapter, and with the Attorney General's role as parens patriae, which may be necessary or appropriate to protect and promote the welfare of consumers;

(6) negotiate and enter into agreements for compliance by merchants with the provisions of this chapter; or

(7) publicize its own actions taken in the interests of consumers.

D.C.Code § 28–3910 also was added:

In the course of an investigation to determine whether to seek relief under section 28–3909, the Attorney General may subpoena witnesses, administer oaths, examine an individual under oath, and compel production of records, books, papers, contracts, and other documents. Information obtained under this section is not admissible in a later criminal proceeding against the person who provides the evidence.

69. There is no available recording of a mark-up session on April 20, 2000; the available recording for that day reflects a public hearing pertaining to nominations for a Board and a Commission.

70. The first reading took place on May 19, 2000, and the second reading on June 6, 2000.

71. Relying heavily on *Beard, supra,* which interpreted D.C.Code § 28–3905(k)(1), Judge Ruiz maintains that:

The legislature is presumed to enact laws with knowledge of relevant decisional law.

al standing requirement would be so unusual that we will not lightly infer such intent on the part of the Council. Thus, without a clear expression of an intent by the Council to eliminate our constitutional standing requirement, we conclude that a lawsuit under the CPPA does not relieve a plaintiff of the requirement to show a concrete injury-in-fact to himself.

Having decided that the Council expressed no intent to override or disturb our constitutional standing requirement, we now turn to the task of discerning what the Council did intend in adopting the 2000 amendments to the CPPA. First, it is absolutely clear that the Council intended to give the OCC, now the District's OAG, a larger role in consumer protection enforcement in order to replace DCRA. Thus, the Council amended D.C.Code § 28–3909(a)

to give OAG authority to "recover restitution for property lost or damages suffered by consumers as a consequence of the unlawful act or practice." In addition, the Council empowered OAG to "recover a civil penalty" for "each [CPPA] violation" (D.C.Code § 28–3909(b)); and it authorized OAG to take seven other actions (D.C.Code § 28–3909(c)), including "represent[ing] the interests of consumers before administrative and regulatory agencies and legislative bodies," and "negotiat[ing] and enter[ing] into agreements for compliance by merchants with [ ] provisions [of the CPPA]."

Second, the Council expressed its intent that the CPPA be considered a remedial statute by explicitly stating that "[t]his chapter shall be construed and applied liberally to promote its purpose," D.C.Code

[citation omitted]. Now that the CPPA statute has been amended to eliminate the language we quoted in *Beard* as imposing an injury requirement, it is logical to conclude—absent evidence to the contrary—that the Council intended to dispense with a requirement of injury as a prerequisite to suit, a conclusion that is particularly valid when the legislature is amending the very language that has been the subject of judicial interpretation.

We do not share Judge Ruiz's logic. When the Council intends to override this court's interpretation of one of its statutory enactments, it has not hesitated to identify the case in question explicitly. See, for example, *K.R. v. C.N.*, 969 A.2d 257 (D.C.2009), which referenced the District of Columbia Safe and Stable Homes for Children and Youth Act of 2007 and its legislative history which explicitly addressed (by name) this court's decision in *W.D. v. C.S.M.*, 906 A.2d 317 (D.C.2006) and explained that the legislative enactment would achieve a different result. *K.R., supra,* 969 A.2d at 259 & n. 2. Significantly, we have been unable to find any mention of *Beard* in the drafting and legislative history of the 2000 amendments, either in the D.C. Bar Report which contained a draft of the 2000 amendments, or in the Ambrose Committee Report, or in the Cropp Committee of the Whole Report. Hence, we see no basis for presum-

ing that the 2000 amendments were designed to respond to our interpretation in 1991 of the then existing version of § 28–3905(k)(1). Moreover, Judge Ruiz's presumption argument ignores the impact of D.C.Code § 28–3905(k)(2) which retains the injury concept ("[n]othing in this chapter shall prevent any person who is injured by a trade practice in violation of a law of the District of Columbia ... from ... seeking any remedy to which the person might be entitled or from filing a complaint with any other agency"). Finally, in *Beard,* this court discerned nothing in the consumer protection regulation at issue and the underlying (CPPA) statute that supported the notion that either provision made a remedy available to a party who could "demonstrate no injury whatever." 587 A.2d at 203. The 2000 amendments to the CPPA are consistent with the possibility that the Council (1) intended to eliminate the requirement that a CPPA plaintiff assert what a layperson would describe as actual injury, but (2) had no intent to allow CPPA suits by a plaintiff who can assert neither actual nor statutory injury. Mr. Breakman as a non-subscriber to AOL, can assert neither actual injury, nor deprivation of anything to which he is entitled under the CPPA statute, from AOL's alleged failure to disclose material facts to established customers, and therefore, he could not bring a CPPA suit.

§ 28–3901(c); that is, the purpose of "assur[ing] that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices." D.C.Code § 28–3901(b)(1). In interpreting the mandate to liberally construe and apply the CPPA's provisions, we do not speculate and infer that the Council sought to eliminate our injury-in-fact requirement. Rather, our reading of the legislative and drafting history indicates that the Council expressly sought to augment the remedies available to enforce the CPPA under a revised § 28–3905(k)(1) by providing for injunctive relief and merchant disgorgement of ill-gotten gains, *see, e.g.,* D.C.Code § 28–3905(k)(1)(D)–(E) (2001), and by expanding OAG's CPPA authority.

We are mindful that statutory interpretation is a "holistic endeavor" [72] and that we should construe "each provision of the statute . . . so as to give effect to all of the statute's provisions, not rendering any provision superfluous." [73] In that regard, we read § 28–3905(k)(1) and § 28–3905(k)(2) together to discern the Council's intent regarding our constitutional standing requirement. We conclude that while the amendment to § 28–3905(k)(1) enlarges the category of persons authorized to bring a CPPA enforcement action, the modification to § 28–3905(k)(2) focuses on the cumulative nature of the CPPA remedies,[74] but leaves intact key language which buttresses our conclusion that, read in light of the legislative and drafting history, the 2000 amendments to the CPPA do not evidence an intent by the Council to override or disturb our constitutional

standing requirement. The unchanged sentence pertains to another "right" or "remedy" to which "any person who is injured by a[n unlawful] trade practice . . . might be entitled." A reasonable interpretation of this language is that a person who brings a CPPA enforcement action must have suffered or must be in imminent danger of suffering an injury-in-fact. Thus, when read together, subsection (k)(1) identifies those who may bring a CPPA enforcement action, and subsection (k)(2) focuses on the nature of the remedies in the CPPA chapter and other rights and remedies outside the chapter which might be available to a person who is injured or in imminent danger of being injured by an unlawful trade practice.

## V.

## THE DISTINCTION BETWEEN STANDING REQUIREMENTS AT THE MOTION TO DISMISS AND THE SUMMARY JUDGMENT STAGE

■■■■■ To properly assess whether the respective allegations of Mr. Breakman and Mr. Grayson are sufficient to demonstrate constitutional standing, we must first determine what that inquiry entails during the various stages of litigation. At the pleading stage and when facing a motion to dismiss, a complaint that contains "general factual allegations of injury resulting from the defendant's conduct may suffice"; a motion to dismiss "presume[s] that general allegations embrace those specific facts that are necessary to

---

**72.** *Cook, supra,* 825 A.2d at 946.

**73.** *Tangoren, supra,* 977 A.2d at 361 n. 12.

**74.** To make the CPPA chapter consistent with the antitrust chapter, the Council accepted the recommendation of the legislative committee of the Working Group, that it add the

following sentence to D.C.Code § 28–3905(k)(2): "The remedies or penalties provided by this chapter are cumulative and in addition to other remedies or penalties provided by law." D.C.Code § 28–4514 of the antitrust chapter specifies: "The remedies provided for in this chapter are cumulative."

support the claim." [75] "For purposes of ruling on a motion to dismiss for want of constitutional standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." [76] Before ruling on the motion to dismiss, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing"; and "[i]f, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." [77]

When a lawsuit reaches the summary judgment stage, the "mere allegations" of the pleadings become insufficient. Constitutional standing must be shown through "specific facts" set forth "by affidavit or other evidence" to survive a motion for summary judgment.[78]

To meet these varied burdens, a plaintiff must allege facts showing the following: (1) "the plaintiff['s] ... injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court"; [and] (3) a likelihood, as opposed to mere speculation, that an "injury will be redressed by a favorable decision." [79] As appellants' lawsuits were dismissed at the pleading stages, we review the substance of their pleadings to determine whether "general factual allegations" satisfying each of these requirements have been averred.

## VI.

## MR. BREAKMAN'S COMPLAINT AND THE STANDING ISSUE

In his complaint, Mr. Breakman proclaims that AOL violated the CPPA by failing to disclose to current District of Columbia dial-up users that new dial-up members essentially receive the same service for a significantly smaller monthly payment. Paragraph 12. He does not claim to have been personally injured by AOL, but brings his suit solely in a "representative capacity on behalf of the interests of the general public...." [80] Paragraph 5. In sum, Mr. Breakman's complaint is self-defeating; by resting his claim entirely "on the legal rights or interests of third parties"; he cannot dem-

---

75. *Lujan, supra,* 504 U.S. at 561, 112 S.Ct. 2130 (citations and internal quotation marks omitted); *see also Bennett v. Spear,* 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (determining that petitioner "allege[d] the requisite injury in fact" and complaint should not have been dismissed for lack of standing; "Given petitioners' allegation ... it is easy to presume specific facts under which petitioners will be injured....")

76. *Warth, supra,* 422 U.S. at 501, 95 S.Ct. 2197 (citation omitted).

77. *Id.* at 501–02, 95 S.Ct. 2197.

78. *Lujan, supra,* 504 U.S. at 561, 112 S.Ct. 2130 (citations and internal quotation marks omitted).

79. *Id.* at 560–61, 112 S.Ct. 2130 (citations and internal quotation marks omitted). As discussed *supra,* the Council's 2000 amendments to the CPPA did not abrogate these requirements.

80. Since we conclude that Mr. Breakman does not have standing, we take no position on Judge Ruiz's analysis of whether Mr. Breakman's complaint states a legally viable claim.

onstrate the requisite injury-in-fact for standing in our courts.[81] By stating that he brings his claim in a wholly representative capacity, Mr. Breakman essentially implies that as the "party seeking review," he "himself [is not] among the injured." [82]

Our principles of justiciability recognize that the injury-in-fact requirement can be satisfied "solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" [83] But without any claimed invasion of statutorily conferred rights and without any other "distinct and palpable injury" personal to Mr. Breakman, we cannot justify the invocation of our jurisdiction and the "exercise of . . . remedial powers" on his behalf. Mr. Breakman's only connection to the affected AOL customers is residence in the District; he is in no different a position to bring this claim than any other unaffected citizen. Paragraph 14. Mr. Breakman's "mere interest" in the alleged unlawfulness of AOL's business practices, "no matter how longstanding the interest and no matter how qualified [he] is in evaluating the problem, is not sufficient by itself to render [him] adversely affected or aggrieved for standing purposes." [84] Because he failed to allege the requisite injury-in-fact, we conclude that the trial court properly

dismissed Mr. Breakman's claim for want of subject matter jurisdiction.[85]

## VII.

## MR. GRAYSON'S COMPLAINT AND THE STANDING ISSUE

We now review the trial court's conclusion that Mr. Grayson lacks standing because he "cannot show that he or any other customer was injured." This task requires us to determine whether Mr. Grayson alleged facts sufficient to demonstrate standing in the context of a motion to dismiss. We consider Mr. Grayson's standing to present his CPPA claim as a threshold inquiry, independent of the merits of his interpretation of the CPPA. *See Public Citizen, supra,*[86] *Warth, supra,*[87] *Parker, supra.*[88]

The majority of Mr. Grayson's CPPA allegations, which partially share a factual base with his FCA claim, *see Grayson I,* consist of intricate elaborations concerning appellees' practices, and how such practices constitute unlawful conduct in violation of the CPPA. Mr. Grayson describes appellees' withholding of breakage with great detail, including millions of dollars since 1992, and the retention, as of June 30, 2003, of sums exceeding $500,000 in

81. *See, e.g., Warth, supra,* 422 U.S. at 499, 95 S.Ct. 2197.

82. *See, e.g., Lujan, supra,* 504 U.S. at 563, 112 S.Ct. 2130.

83. *E.g., Warth, supra,* 422 U.S. at 500, 95 S.Ct. 2197; *accord Lujan, supra,* 504 U.S. at 578, 112 S.Ct. 2130.

84. *See, e.g., Friends of Tilden Park, supra,* 806 A.2d at 1207.

85. Not only does Mr. Breakman fail to allege any theory of organizational or associational standing, but we also cannot analogize his representational claim to that of a plan bene-

ficiary under ERISA, 29 U.S.C. § 1132, who might be able to bring a representative action against a plan fiduciary without having suffered any injury. *See Horvath v. Keystone Health Plan E., Inc.,* 333 F.3d 450, 456 (3d Cir.2003). *But see McCullough v. AEGON USA, Inc.,* 585 F.3d 1082, 1087 n. 3 (8th Cir.2009) (holding that a party who suffers no injury does not necessarily have standing to bring an action as a representative of an injured third-party in ERISA actions).

86. 491 U.S. at 449–50, 109 S.Ct. 2558.

87. 422 U.S. at 500, 95 S.Ct. 2197.

88. 478 F.3d at 376–77.

dormant communications prepayments made by persons with District of Columbia addresses; these sums are alleged to have been recorded as revenues or profits. Significantly, Mr. Grayson states that he "[Plaintiff] obtained and used prepaid calling cards in the District, the unused value of which [appellees] have failed to report and pay to the Mayor," Paragraph 32, and that at least one defendant "pocketed, *i.e.*, recognized [prepaid calling card balances] as revenue without an offsetting liability, whenever a card has been 'dormant' for more than twelve months (whether or not the card has an 'expiration date' or is rechargeable)." Paragraph 64. He alleges that despite advertising and offering "communications services whose price is equal to the amount of the prepayment," defendants have not provided these services in the District. Paragraph 166, 167. Furthermore, Mr. Grayson asserts that defendants have failed to inform their customers in the District that they have provided services "whose price is less than the amount of the prepayment"; and that they have failed to turn over breakage to the District for the benefit of those who obtained defendants' calling cards in the District, including the elderly and the disabled. Paragraphs 164, 168, 169–173, 177.

Thus, Mr. Grayson claims, in part: (1) appellees' representation that prepayment equaled the purchase price of the card is a misrepresentation of material fact in violation of D.C.Code § 28–3904(a) and § 28–3904(e); (2) appellees' advertisements that customers would receive services equal to the amount of prepayment when appellees had no intention of provid-

ing the full value of services violates D.C.Code § 28–3904(h); (3) appellees' retention of breakage knowing that "customers would be unable to receive substantial benefits from such breakage" demonstrates that appellees "knowingly [took] advantage of the inability of the customer to reasonably protect his interests" due to age, infirmity, ignorance, or illiteracy, in violation of D.C.Code § 28–3904(r); and (4) appellees' failure to inform or to disclose to consumers who obtained their calling cards in the District the fact that they have retained breakage as profit, rather than reporting and turning it over to the District, as required by law, constitutes a material fact that tends to mislead, in violation of D.C.Code § 28–3904(f).

In part, Mr. Grayson seeks injunctive relief for appellees' alleged violations of D.C.Code § 28–3904(a), (e), (f), (h) and (r): "[o]rders and judgments necessary to prevent the Defendants' use or employment of the trade practice of failing to report and pay or deliver escheated prepaid communications breakage to the Mayor." As one court has said with respect to injunctive relief in the ERISA setting, "it is well established that '[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'"[89]

Mr. Grayson brings his "cause of action for the interests of himself and the general public." Paragraph 157. In terms of standing in this case, Mr. Grayson's injury is derived solely from a violation or an invasion of his statutory legal rights creat-

---

**89.** *Horvath, supra,* 333 F.3d at 456 (other citations omitted). *Horvath* further stated:

Here, the disclosure requirements and fiduciary duties contained in ERISA create in Horvath certain rights, including the rights to receive particular information and to have [appellee] act in a fiduciary capacity.

Thus, Horvath need not demonstrate actual harm in order to have standing to seek injunctive relief requiring that [appellee] satisfy its statutorily-created disclosure or fiduciary responsibilities.

*Id.* (citation omitted).

ed by the CPPA.[90] Our analysis of injury under the CPPA aligns with the opinion of the D.C. Circuit in *Shaw v. Marriott Int'l Inc.*,[91] where the court observed that "[t]he deprivation of . . . a statutory right [to be 'free from improper trade practices'] may constitute an injury-in-fact sufficient to establish standing, even though the plaintiff 'would have suffered no judicially cognizable injury in the absence of [the] statute.'"[92] *See also United States v. Students Challenging Regulatory Agency Procedures (SCRAP).*[93]

The basis for Mr. Grayson's standing and the manifestation of his alleged injury in fact is similar to that in *Havens, supra.* There, the Court determined that § 804(d) of the Fair Housing Act[94] "established an enforceable right to truthful information concerning the availability of housing," *id.* at 373, 102 S.Ct. 1114, and thus, plaintiffs were injured in fact and had standing to sue because of "deprivation of information about housing availability," *FEC v. Akins.*[95] *Akins* also declared that "[t]he 'injury in fact' that respondents have suffered [in *Akins* ] consists of their inability to obtain information," based on a statutory provision conferring rights on respondents. Moreover, in *Shays v. FEC* the court concluded that appellee/cross-appellant's "injury in fact is the denial of information he believes the law entitles him to."[96]

Mr. Grayson alleges personal injury to himself, or injury in fact, based on the defendants' violation of his statutory right (derived from D.C.Code § 28–3904) to the disclosure of information about their failure to report and turn over to the District government breakage for the benefit of those who obtain calling cards in the District.[97] *See Havens, Akins, Shays, supra.*

**90.** *See Warth, supra,* 422 U.S. at 500, 95 S.Ct. 2197 (noting that an injury required by Article III "may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing'").

**91.** 390 U.S.App.D.C. 422, 605 F.3d 1039 (2010).

**92.** *Id.,* 605 F.3d at 1042 (citing *Warth, supra,* 422 U.S. at 514, 95 S.Ct. 2197; *Zivotofsky ex rel. Ari Z. v. Secretary of State,* 370 U.S.App. D.C. 269, 274, 444 F.3d 614, 619 (2006)).

**93.** 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The Supreme Court made clear that "in interpreting 'injury in fact' . . . standing [is] not confined to those who [can] show 'economic harm'"; nor is "the fact that many persons share[ ] the same injury . . . sufficient to disqualify [a person] from seeking [judicial] review. . . ." *Id.* at 686, 93 S.Ct. 2405. Moreover, a person's "direct stake in the outcome of a litigation . . . [may be] small" but the Court has "allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than the fraction of a vote, [or] a $5 fine and costs." *Id.* at 689 n. 14, 93 S.Ct. 2405 (citations omitted).

**94.** Section 804(d) provided that "it shall be unlawful . . . [t]o represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."

**95.** 524 U.S. 11, 21, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (citing *Havens, supra,* 455 U.S. at 373–74, 102 S.Ct. 1114).

**96.** 381 U.S.App.D.C. 296, 305, 528 F.3d 914, 923 (2008).

**97.** As in *Public Citizen, supra,* Mr. Grayson's factual allegations are sufficient to require the court to consider whether he is correct that the CPPA endows a consumer with a right to such information: he has alleged a sufficient 'personal stake' (he personally obtained calling cards in consumer transactions in which the breakage information was not disclosed) to oblige the court to determine whether his legal theory about the applicability of the CPPA is correct. Therefore, as in *Public Citizen,* Mr. Grayson has Article III standing to have the court answer the merits question, even if the court would answer it in the negative.

Among other relief authorized by the CPPA, he seeks to enjoin this alleged unlawful practice.

As for the two remaining prongs of standing, Mr. Grayson's pleading meets these requirements. In describing appellees' conduct with great detail, Mr. Grayson amply draws a "causal connection" between the injury he suffered as defined by the CPPA and how appellees' allegedly unlawful conduct led to or threatened such an injury. With respect to the third *Lujan* prong, redressability by a favorable decision, the very design of the CPPA's injunctive remedy serves to sufficiently redress the alleged threatened statutory injury, and he also seeks "a remedy for treble damages or $1500 for each violation, whichever is greater." Since Mr. Grayson satisfies the three prongs of standing as enumerated in *Lujan*, we conclude that, with the exception of defendant Verizon Communications Corp. and its affiliates,[98] the trial court erred in dismissing his individual CPPA claim on the ground that he personally lacked standing.[99]

## VIII

## MR. GRAYSON'S COMPLAINT AND THE RULE 12(b)(6) ISSUE

■ Finally, we turn to the second ground on which the trial court dismissed Mr. Grayson's complaint—failure to state a claim for which relief may be granted (Super. Ct. Civ. R. 12 (b)(6)). "All that is required when we consider the sufficiency of the pleading [under Rule 12(b)(6) ] is a short and plain statement of the claim showing that the pleader is entitled to relief." *Solers, supra.* Nevertheless, we may dismiss a complaint under Rule 12(b)(6) "where the complaint fails to allege the elements of a legally viable claim." *Chamberlain v. American Honda Fin. Corp.*[100]

■ Mr. Grayson's lawsuit focuses on D.C.Code § 28–3904, which addresses unlawful trade practices.[101] He alleges a vio-

---

98. In Paragraph 23 of his complaint, Mr. Grayson lists retail chains at which defendants distributed prepaid calling cards and from which he purchased cards, including locations in the District. He does not include Verizon, although he notes that 'Radio Shack also has distributed calling cards for Defendant Verizon.' We infer from Paragraph 23 and the accompanying footnote 5 that Mr. Grayson did not purchase a Verizon calling card in the District, and hence, he is in the same posture as Mr. Breakman is with respect to AOL. In short, he does not have standing as to Verizon and its affiliates.

99. *See Lujan, supra,* 504 U.S. at 560–61, 112 S.Ct. 2130.

100. 931 A.2d 1018, 1023 (D.C.2007) (citation omitted).

101. D.C.Code §§ 28–3904(a), (e), (f), (h), and (r) provide in pertinent part:
It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:

(a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
. . . .
(e) misrepresent as to a material fact which has a tendency to mislead;
(f) fail to state a material fact if such failure tends to mislead;
. . . .
(h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;
(r) make or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:
. . . .
(2) knowledge by the person at the time of the sale . . . of the inability of the consumer to receive substantial benefits from the property or services sold or leased;
. . . .

lation of § 28–3904(a) involving a "represent[ation] that goods ... have benefits ... that they do not have." The problem with Mr. Grayson's complaint is that it does not identify a representation by defendants about their calling cards that fits within this subsection. For example, there is no averment that defendants affixed a notice to the calling card indicating that customers could talk for 30 more minutes than they paid for (when in reality they could not), or that if they failed to use all of their minutes within one, two or three years, the remaining amount would go to a District charity or the District government (but instead they counted the remaining minutes as profit). Thus, Mr. Grayson has not stated a legally viable claim under § 28–3904(a).

We have said with respect to §§ 28–3904(e) and (f) that a person bringing suit under these sections "need not allege or prove intentional misrepresentation or failure to disclose to prevail on a claimed violation...." *Fort Lincoln Civic Ass'n, Inc v. Fort Lincoln New Town Corp.*[102] We explained that "§ 28–3904(e) and (f) describe simple misrepresent[ation] as to a material fact which has a tendency to mis-

lead and fail[ure] to state a material fact if such failure tends to mislead."[103] Even though Mr. Grayson does not have to allege that a misrepresentation or failure to disclose is intentional, to survive the Rule 12(b)(6) motion to dismiss his subsections (e) and (f) claims, he must allege a material fact that tends to mislead. A close reading of his amended complaint reveals that he has not identified any material fact that defendants either stated or failed to disclose about the calling cards that he and others obtained in the District of Columbia; without the identification of a material fact he obviously cannot demonstrate any tendency of the defendants to mislead consumers. He makes no showing through his allegations or reasonable inferences from them that the telephone companies' treatment of breakage deprives him or other consumers of the full value of their calling cards, nor any showing that a reasonable consumer would consider information about how a phone company treats breakage to be material to the decision to purchase a calling card from that company.[104] In short, after construing Mr. Grayson's complaint in the light most favorable

(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors....

**102.** 944 A.2d 1055, 1073 (D.C.2008) (citing *The Chelsea Condo. Unit Owners Ass'n v. 1815 A St. Condo. Grp., LLC*, 468 F.Supp.2d 136, 142 n. 6 (D.D.C.2007) ("distinguishing plaintiff's fraud claims from their CPPA claims")).

**103.** *Id.* at 1073. The RESTATEMENT OF THE LAW (SECOND) TORTS defines misrepresentation:

One who, in a sale, rental or exchange transaction with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act or to refrain from acting in reliance upon it, is

subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

*Id.* § 552C.

**104.** *See Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C.2008) ("a claim of an unfair trade practice is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer"); *Fort Lincoln Civic Ass'n, supra,* 944 A.2d at 1071 (a material fact was the failure to disclose obligations under a Land Disposition Agreement, including the obligation to establish and fund a non-profit corporation controlled by residents); *Caulfield v. Stark*, 893 A.2d 970, 979 (D.C.2006) (doctor's reference, in a small space on the billing form, to diarrhea as one of other symptoms did not amount to a failure to state a material fact).

to him, we cannot say that he has alleged "a material fact" that defendants have made that tends to mislead.[105]

We are unpersuaded that Mr. Grayson has alleged the elements of viable claims under § 28–2904(h); his averments under § 28–3904(h) do not identify any advertisement of calling cards that appellees have made in the District; nor do they provide any facts that show the unlawful intent of appellees in selling the cards.

A viable claim under § 28–3904(r) requires allegations showing that a trade practice is "unconscionable" as measured by several statutory factors set forth in § 28–3904(r)(1) through (5). *See Hughes v. Abell.*[106] Mr. Grayson makes allegations with respect to 28–3904(r)(2)—"knowledge by the [seller] at the time of the sale ... of the inability of the consumer to receive substantial benefits ... from the services sold." But he has identified no statement or practice in his amended complaint made or employed by any of the defendants which directly or through reasonable inference shows that the defendants knew that consumers would not receive substantial benefits from their calling cards. Mr Grayson alleges a claim under § 28–3904(r)(5) which pertains to persons who "ha[ve] knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors." Other than conclusory allegations pertaining to vulnerable members of the District's population—the elderly and the disabled—Mr. Grayson's complaint is devoid of allegations demonstrating even by innuendo that defendants have issued calling cards in the District that enable them to take advantage of these segments of the population.

In sum, on this record we are constrained to conclude that Mr. Grayson's amended complaint is legally insufficient to withstand a Super. Ct. Civ. R. 12(b)(6) motion with regard to his claims under D.C.Code § 28–3904(a), (e), (f), (h) and (r)(2) and (r)(5).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court in Mr. Breakman's case (No. 08–CV–1089); we disagree with the trial court's ruling that Mr. Grayson's complaint (No. 07–CV–1264) failed to meet the requirements of Rule 12(b)(1) as to his individual standing to seek injunctive or other relief, but we affirm its dismissal of his complaint under Rule 12(b)(6).

*So ordered.*

RUIZ, Associate Judge, concurring in part and dissenting in part:

Although I conclude that both appellants had standing to bring suit, I agree with the court's conclusion that Grayson's complaint was properly dismissed for failure to state a cause of action under the CPPA. Breakman's complaint does state a cause of action, however, and I would reverse and remand his case for further proceedings.

---

**105.** The RESTATEMENT (SECOND) TORTS defines "material":

The matter is material is
(a) a reasonable man [or woman] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question; or
(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable man [or woman] would not so regard it. *Id.* § 538(2).

**106.** 634 F.Supp.2d 110, 113 (D.D.C.2009); *see also Carroll v. Fremont Inv. & Loan,* 636 F.Supp.2d 41, 52 (D.D.C.2009).

This appeal presents three issues for consideration:

1) Must a plaintiff, to have standing to sue under the CPPA, allege injury-in-fact?

2) Even if the CPPA does not impose such a requirement, are the District of Columbia courts nonetheless bound to adjudicate only "cases or controversies"?

3) If the answer to the first two questions is no, and appellants therefore have standing to sue, did appellants' complaints state a cause of action under the CPPA?

I answer the first two questions in the negative. As to the third, although I disagree with the majority opinion that appellants had to show injury-in-fact to sue under the CPPA, I agree that Grayson's complaint did not allege any unlawful trade practice cognizable under the CPPA; therefore, I agree with the court's affirmance of the trial court's dismissal of his complaint for failure to state a cause of action. Because I believe that Breakman has standing to sue without alleging injury-in-fact, I must address whether his complaint states a cause of action and conclude that it does; therefore, I would reverse the dismissal of his complaint and would remand his case for further proceedings.

## I. Does the CPPA require injury-in-fact as a prerequisite to suit?

The principal, and, for me, difficult issue presented in this appeal is whether the CPPA statute permits a person to sue for relief against unlawful trade practices regardless of whether that person can show injury-in-fact. Appellants and *amici*[1] present a strong textual argument that the Council of the District of Columbia intended just that when it amended the statute in 2000 to delete language that permitted suit by "[a]ny consumer who suffers any damage as a result of a trade practice" made unlawful by D.C. law, in favor of language that now allows suit by "[a] person, whether acting for the interests of itself, its members, or the general public ... seeking relief from the use by any person of a trade practice" unlawful under D.C. law. *Compare* D.C.Code § 28–3905(k)(1) (1981) (1996 Repl.) with D.C.Code § 28–3905(k)(1) (2001). The statute defines "person" as including "an individual, firm, corporation, partnership, cooperative, association, or any other organization, legal entity, or group of individuals however organized." D.C.Code § 28–3901(a)(1) (2001). It is undeniable that the combination of the expansive definition of "person"—it is difficult to conceive of a broader definition—with the grant to a "person" of the right to sue "whether acting for the interests of itself, its members, or the general public" is, on its face, sweeping in scope.[2]

---

**1.** Three amicus briefs were filed supporting appellants, on behalf of (1) Legal Aid Society of the District of Columbia, Public Citizen, Inc., Center for Science in the Public Interest, National Association of Consumer Advocates, and National Consumer Law Center; (2) National Consumers League, and individual consumers Jarrod Beck, Keerthi Reddy and Erin Galloway; and (3) Brit A. Shaw.

**2.** Subsection (k)(2) provides a helpful contrast in the statute's use of standing language. Unlike the right of action created in subsection (k)(1) discussed in the text, subsection (k)(2) provides that "any person *who is injured by a trade practice*" made unlawful by D.C. law and within the jurisdiction of DCRA, is not precluded from "exercising any right or seeking any remedy to which the person might be entitled or from filing any complaint with any other agency." (Emphasis added). Subsection (k)(2) states that the remedies in the CPPA are "cumulative and in addition to other remedies and penalties provided by law." The reservation of these additional remedies for "injured" persons underscores the Council's use of language imposing an injury re-

The broad sweep of the 2000 amendments is to be compared with the language it replaced: "any consumer who suffers any damage as a result of" an unlawful trade practice. D.C.Code § 28–3905(k)(1) (1996 Repl.). "[A] change in legislative language gives rise to the presumption that a change was intended in legislative result." *United States v. Brown,* 422 A.2d 1281, 1284 (D.C.1980). It is important to note that this is not a case where the legislature solely omitted language that appeared in a parallel statute, as we recently considered in *Gause v. United States,* 6 A.3d 1247 (D.C.2010). As appellants point out, the language that was deleted has been the subject of judicial interpretation by this court on the same issue of standing that is before us, which gives added weight to the usual presumption that substantive change was intended. In *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195 (D.C.1991), we relied on the language that was eliminated in the 2000 amendments in concluding that:

> [s]uffering damage is a condition precedent to suit, and one who has not been injured cannot sue under this statute for any relief whatever. Nothing in the regulations purports to extend the statutory right to such relief, or, indeed, to any remedy, to an individual who has suffered no injury.

*Id.* at 204. The legislature is presumed to enact laws with knowledge of relevant decisional law. *See Office of People's Counsel v. Public Serv. Comm'n,* 477 A.2d 1079, 1091 (D.C.1984). Now that the CPPA statute has been amended to eliminate the language we quoted in *Beard* as imposing an injury requirement, it is logical to conclude—absent evidence to the contrary— that the Council intended to dispense with a requirement of injury as a prerequisite to suit, a conclusion that is particularly valid when the legislature is amending the very language that has been the subject of judicial interpretation.[3]

Although courts, including this one, *see Burgess v. United States,* 681 A.2d 1090, 1095 (D.C.1996), have been reluctant to go beyond consideration of language that appears clear on its face, the effect of a plain meaning interpretation of the 2000 amendments is so foreign to the manner in which we have understood and applied principles of standing, that I do not object to the majority's recourse to legislative history as a further tool to ascertain legislative intent. *See Jones v. United States,* 526 U.S. 227, 234, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) ("Congress is unlikely to intend any radical departures from past practice without making a point of saying so."). In *Gause* we declined to apply the presumption that a "radical departure from past practice" was intended by a change in language because the legislative history

---

quirement for standing to enforce "other" laws, but not the CPPA.

**3.** This logic is not undermined, as the majority argues, by the fact that the Council has sometimes seen fit to change the result of a judicial decision with which it disagrees by subsequent legislation, and in doing so has mentioned the judicial opinion in the legislative history. *See, e.g., Tippett v. Daly,* 10 A.3d 1123, 1136–37 (D.C.2010). Unlike in *K.R. v. C.N.,* 969 A.2d 257 & n. 2 (D.C.2009), on which the majority cites, where the Council intended to change a judicial result because it

disagreed with the court's interpretation, here the Council's motivation was not to overturn a prior opinion of the court but to amend the statute in light of changed budgetary constraints by adopting statutory language entirely different from that which the court had previously interpreted. The point here is that when the Council amended the CPPA in 2000 in order to enhance private enforcement of the CPPA, it did so by eliminating language in the statute that had received a particular judicial construction, a construction the legislature is presumed to know.

was absolutely silent on the issue and the statute's purpose did not support it. *See Gause*, 6 A.3d at 1260 & n. 5. In this case, consideration of the legislative history of the CPPA amendments and the purpose of the statute, however, does not lead me to the conclusion the majority reaches that the *status quo ante* the amendments should prevail in terms of standing. Rather, it tends to confirm that the broad sweep of the amended language should be given effect.

As the opinion for the court describes in detail, the 2000 amendments to the CPPA were the product of budgetary constraints. The District was suffering from serious revenue shortfalls and, as a result, its expenses had to be reduced. One of the expenses that was entirely cut was funding for the Department of Consumer and Regulatory Affairs enforcement arm responsible for enforcing the CPPA. In amending D.C.Code § 28–3905(k)(1), the CPPA section that creates a private right of action, the Council was attempting to supplement, with private efforts, the gap in public enforcement that would result from the budget cuts. Substitution of private for public enforcement was to be accomplished by expanding the categories of plaintiffs who could sue to enforce the law. Elimination of traditional injury-in-fact as a prerequisite to standing in favor of suit by a "person" (broadly defined) "whether acting for the interests of itself, its members, or the general public" is fully consistent with this goal. D.C.Code § 28–3905(k)(1). Also consistent with this purpose was the clarification, in the remedies section, of the availability of injunctive and other equitable relief ("in representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice"). *Id.* at (k)(1)(D) & (E).

The majority recognizes that the purpose of the 2000 amendments was to enhance the tools available to enforce the CPPA, but its interpretation concludes that the only way in which it sought to do so was by "augment[ing] the remedies available to enforce the CPPA under a revised § 28–3905(k)(1) by providing for injunctive relief and merchant disgorgement of ill-gotten gains." See *ante* at 245.[4] I have no doubt that the Council intended to do what the majority says in terms of remedies, but that is only part of what the Council must have intended, for enhancement of remedies in no way accounts for the change in the language describing who may bring suit, from "a consumer who has suffered injury," to a "person, whether acting for the interests of itself, its members, or the general public." D.C.Code § 28–3905(k)(1). Although the majority appears to recognize that the CPPA was amended to "enlarge[ ] the category of persons authorized to bring a CPPA enforcement action," see *ante* at 245, it does not explain how, under its interpretation, that category has been "enlarged." Because the definition of "person" was unchanged by the 2000 amendments, the only "enlargement" in the "category of persons"—as opposed to remedies—has been effectuated by the elimination of the "any consumer who suffers any damage" language we relied on in *Beard* as imposing an injury requirement as a precondition to suit and its substitution with the more liberal language. Although it does not quite say so, the majority opinion implies

4. As the majority notes, however, the specification of injunctive relief and restitution to consumers was more a clarification than a change, as the statute already provided (and still provides) for "any other relief which the court deems proper." D.C.Code § 28–3905(k)(1)(F).

that the "enlargement" is that certain entities may now bring "representative" actions to prevent injury to consumers, see *ante* at 240, but still subject to the injury-in-fact requirement. But even before the 2000 amendments, an organization had injury-in-fact standing to sue if it was itself a "consumer"[5] that had been injured or sued as a representative of its consumer members who had been injured. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (noting that "concrete and demonstrable injury to [an] organization's activities" suffices to establish [constitutional] standing to the organization "whether the injury is economic or non-economic") (*quoted in Friends of Tilden Park v. District of Columbia*, 806 A.2d 1201, 1207 (D.C.2002)). If the Council's purpose was as limited as the majority's interpretation implies, it simply should have changed the statute to say that a "person" (rather than a "consumer"), which includes "any ... organization, legal entity or group, however, organized," "who suffers any damage as a result of an unlawful trade practice" could sue. Instead, the Council went further, and deleted "who suffers any damage," substituting it with "whether acting for the interests of itself, its members, or the general public." My disagreement with the majority's textual analysis is that it does not give any content to that substantive change in statutory language, rendering it wholly superfluous.

There are two additional aids to statutory interpretation that support an interpretation that there is no longer an injury-in-fact requirement for standing to sue under the CPPA. The first is embedded in the statute itself and was added by the 2000 amendments: "This chapter shall be construed and applied liberally to promote its purpose." D.C.Code § 28–3901(c). One of the statute's purposes, as the majority notes, is to "assure that a just mechanism exists to remedy *all* improper trade practices and the continuing use of such practices." D.C.Code § 28–3901(b)(1) (emphasis added). Another stated purpose of the CPPA is to "promote, through effective enforcement, fair business practices throughout the community." *Id.* at (b)(2). The legislative mandate to "construe[ ] and appl[y] liberally" to promote these purposes further supports that the court should not shrink from giving the language of subsection (k)(1) its plain meaning. Even without the 2000 amendments mandate that the CPPA should be "construed and applied liberally," we had commented that "the CPPA is, 'to say the least, an ambitious piece of legislation,' with broad remedial purposes." *DeBerry v. First Gov't Mortgage & Investors Corp.*, 743 A.2d 699, 700 (D.C.1999) (quoting *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 708 (D.C.1981)); *cf., Tippett*, 10 A.3d at 1135–36 (Ruiz, J., dissenting) (concluding that statutory provision is ambiguous and applying statutory mandate that ambiguities are to be resolved in favor of "strengthening the legal rights of tenants and tenant organizations").

Secondly, the initial drafters used and cited the California Unfair Competition Law as a model for the CPPA amendments. *See* Legislative Committee of the Public–Private Working Group on Consumer Affairs, The Consumer Protection

---

**5.** " '[C]onsumer' means a person who does or would purchase, lease (from), or receive consumer goods or services, including a co-obligor or surety, or a person who does or would provide the economic demand for a trade practice; as an adjective, 'consumer' describes anything, without exception, which is primarily for personal, household, or family use[.]" D.C.Code § 28–3901(a)(2).

Amendment Act of 1999 at 3 (citing Cal. Bus. & Prof.Code § 17200 *et seq.*); *see also* District of Columbia Practice Manual, Consumer Protection, 8–1 (2009) ("The 'private attorney general' provision [of the CPPA] is modeled after a provision of California's Unfair Competition Law."). The California statute, which contains very similar language to the CPPA's subsection (k)(1) creating a private cause of action,[6] had at the time that the Council enacted the amendments been interpreted by the California Supreme Court as permitting "a private plaintiff who has himself suffered no injury at all [to] sue to obtain relief for others." *Stop Youth Addiction v. Lucky Stores*, 17 Cal.4th 553, 71 Cal.Rptr.2d 731, 950 P.2d 1086, 1091 (1998) (citing *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660, 668 (1983) ("Allegations of actual deception, reasonable reliance and damage are unnecessary.")), *superseded by statute initiated by Proposition 64*, Cal. Bus. & Prof.Code § 17204, *as recognized by Arias v. Superior Court*, 46 Cal.4th 969, 95 Cal.Rptr.3d 588, 209 P.3d 923 (2009). Although it is true, as the majority notes, that this interpretation was not referred to in the Council reports, it remains significant that the California Supreme Court gave effect to the plain meaning of very similar language in a consumer protection statute—an indication that there is nothing inherently "absurd" or even "unreasonable" in such an expansive approach to enforcement of consumer protection laws.

That this also would have been the Council's intent in the 2000 amendments is supported by other provisions of the CPPA. For example, the CPPA defines actions constituting unlawful trade practices in violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby...." D.C.Code § 28–3904. This statutory definition stands in contrast to our observation in *Beard* that nothing in the regulations that the suit brought under the CPPA sought to enforce "purports to extend the statutory right to such relief ... to an individual who has suffered no injury." 587 A.2d at 204. Here, a trade practice, to be unlawful and a violation of the CPPA, need not cause actual injury. This is the reason why, even with no damages, a consumer may recover a statutory civil penalty of $1500 per violation. *See* D.C.Code § 28–3905(k)(1)(A). Similarly, the D.C. Attorney General has authority to sue to enjoin unlawful trade practices without being "required to prove damages...." D.C.Code § 28–3909(a); in addition, the D.C. government may recover "a civil penalty of not more than $1000 for each violation." *Id.* at (b). *Cf.* D.C.Code § 28–3903(a) (providing that DCRA, "the principal consumer protection agency of the District of Columbia government," D.C.Code § 28–3902(a), may investigate consumer complaints and initiate its own investigations "where the (i) amount in controversy totals $250 or more; or (ii) case, or cases, indicates a pattern or practice of abuse on the part of a business or industry."). A plain-meaning interpretation of the 2000 amendments with respect to the right to sue by private parties, in other words, is in line with the statute's pre-existing provisions that no damages are required for injunctive actions by the Attorney General and that actual damage to consumers is not an element of an unlawful trade practice that otherwise meets the definition of § 28–3904. That these

---

**6.** At the time of the 2000 CPPA amendments § 17204 of the California Unfair Competition Law provided that "any relief pursuant to this chapter shall be prosecuted ... by any person acting in the interests of itself, its members or the general public." Cal. Bus. & Prof.Code § 17204 (2000).

concepts of "no injury" would have been extended to actions by persons acting as private attorneys general at a time when the Council was seeking to supplement strained public resources is not at all unreasonable.

While I am not unsympathetic to the majority's preference that the Council have expressed itself unequivocally in the legislative history and demonstrated that it understood our usual standing requirements and recognized the significant change the amendment language would bring about, I know of no other case where we have imposed such an additional burden on the legislature where the statutory language is otherwise clear and consistent with the statute's broad remedial purpose. Concerns expressed by appellees and their *amici*[7] about the potential for abuse and procedural difficulties that might be created by the CPPA's far-reaching private attorney general provision are based on policy, not law.[8] As such, they should be addressed to the legislature, not the court charged with implementing a statute that the legislature has enacted. As the California Supreme Court stated in rejecting a similar challenge to a plain-meaning interpretation of the private attorney general provision in California's Unfair Competition Law, "it is not for the courts, ... to determine whether or not the policy of a statute is economically sound or beneficial. That is a matter solely for the legislature."

*Stop Youth Addiction, Inc.*, 71 Cal.Rptr.2d 731, 950 P.2d at 1102 (quoting *ABC Internat. Traders, Inc. v. Matsushita Electric Corp.*, 14 Cal.4th 1247, 61 Cal.Rptr.2d 112, 931 P.2d 290 (1997)).

Finally, I see no inherent unfairness in this statutory scheme such that we should be reluctant to assume that the Council meant what it said or refuse to give it effect. That virtually anyone, regardless of injury, can bring suit to enforce the law is not common, but it bears emphasizing that it does not mean that a plaintiff who suffers no individualized injury can recover windfall damages, as any such claim for damages would fail for failure of proof. The statute, by its terms, provides that trebled damages and the statutory penalty ($1500 per violation) are "payable to the consumer," D.C.Code § 28–3905(k)(1)(A), a category that is narrower than a "person" who may bring suit as a private attorney general, see note 5, *supra*, and the intended beneficiary of the CPPA. The relief that the statute permits for a plaintiff who has not been personally injured and is not a consumer is an injunction, punitive damages, and "any other relief which the court deems proper." *Id.* at (k)(1)(C), (D) & (F). Trebled damages, statutory civil penalties and "in a representative action, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired

7. On this point, two briefs *amicus curiae* in support of appellees were filed on behalf of Pacific Legal Foundation and United States Chamber of Commerce. The District of Columbia, which also filed a brief *amicus curiae* in support of appellees, disagreed that due process concerns could not properly be addressed, noting that "[t]he due process concerns associated with binding absent parties in a CPPA action brought by a private plaintiff in the interests of the general public are similar to the due process concerns that can arise in a CPPA action brought by the Attorney General." The District's brief suggests several mechanisms that have been employed in litigation to safeguard the rights of absent third parties.

8. The Chamber of Commerce argues that the CPPA should not be given a plain meaning interpretation as eliminating injury-in-fact standing in order to avoid "constitutional infirmities." As explained in the next section, there is no constitutional infirmity, because the D.C. courts are not bound by the "case or controversy" requirement applicable to article III courts.

by means of the unlawful trade practice," are for the benefit of consumers. *Id.* at (k)(1)(A) & (E). All the relief the statute provides, in other words, is either intended for consumers or within the discretion of the trial judge to fashion with the CPPA's consumer protection purpose in mind. With the possible exception of the right to "reasonable attorney's fees" in a case brought by a self-represented plaintiff-attorney—a determination also committed to the trial court's discretion—an uninjured plaintiff who brings suit in the capacity of a private attorney general "in the interests of . . . the general public," even if successful, does not personally benefit from relief awarded by the court. There is no reason to thwart claims authorized by statute at this early pleading stage, based on speculative concern that judges of the Superior Court will be unable to manage litigation brought by private attorneys general on behalf of the public interest in an orderly manner and consistent with due process concerns. *See, e.g., Boyle v. Giral*, 820 A.2d 561, 570 n. 11 (D.C.2003) (interpreting CPPA § 28–3911(a) as permitting *cy pres* distributions into D.C. Consumer Protection Fund); *see also Kraus v. Trinity Management Services, Inc.*, 23 Cal.4th 116, 96 Cal.Rptr.2d 485, 999 P.2d 718, 733 (2000) (noting several procedural mechanisms available to litigants and the courts to avoid multiple liability and repetitive actions).

## II. Did the Congress bind the District of Columbia courts to the article III "case or controversy" requirement for standing?

No one questions the Council's authority to remove prudential limits on standing and we have decided that the Council has done so, for example, in the D.C. Human Rights law. *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 733 (D.C.2000). The question

remains whether the Council may go beyond removing prudential limits, and eliminate the basic injury-in-fact requirement. I conclude that it can, and, as discussed in the previous section, that it did so in creating a private cause of action in the CPPA.

As the majority notes, since 1971, when the Congress enacted court reorganization legislation that created the current structure of the District of Columbia courts, we have adopted the Constitutional "case or controversy" requirement that limits the jurisdiction of courts created by Congress pursuant to article III of the United States Constitution. The first cases arose under the D.C. Administrative Procedure Act, enacted by Congress, which by its terms permits us to "entertain only petitions brought by '[a]ny person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case. . . .' " *Lee v. District of Columbia Bd. Of Appeals & Review*, 423 A.2d 210, 215 (D.C.1980) (quoting D.C.Code § 1–1510 (1978 Supp.)). We have extended that basic standing requirement even when not expressly required by statutory language (as in the D.C. Administrative Procedure Act), but as a number of our cases make clear, that has been a *choice* that the court has made— not a mandate we must follow—because the D.C. courts were created by Congress pursuant to article I of the Constitution, not article III. *See* D.C.Code § 11–101(2). As a result, although we have for the most part followed federal jurisprudence as to what constitutes "injury-in-fact" sufficient to satisfy the case or controversy requirement, *see Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), we have also on occasion felt at liberty to diverge from the Supreme Court's standing jurisprudence in certain limited circumstances, dealing primarily, for example, with the mootness doctrine applicable to cases that

are capable of repetition yet avoid review in the pretrial detention area. *See Tyler v. United States,* 705 A.2d 270, 273 (D.C. 1997) (en banc) (citing *Lynch v. United States,* 557 A.2d 580, 582 (D.C.1989), and distinguishing *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)); *cf., Hardesty v. Draper,* 687 A.2d 1368, 1373 (D.C.1997) (concluding that case was moot where issue was not "capable of repetition yet evading review" even as to another litigant). In this regard, I agree with Judge Reid's opinion for the division:

> [T]he constitutional and prudential standing principles this court imposes are not mandatory. Those principles "originally evolved as a mechanism to enforce the mandate of Article III of the Constitution that federal courts have jurisdiction only in 'cases' and 'controversies.'" *Lee v. District of Columbia Bd. of Appeals & Review,* 423 A.2d 210, 216 n. 13 (1980) (citing *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)) (other citation omitted). "In creating this court … Congress provided that we, like the federal courts, should hear only '[cases] and controversies.'" *Id.* (citing D.C.Code § 11–705(b); *United States v. Cummings,* 301 A.2d 229, 231 (D.C.1973) (per curiam)). Thus, we have generally adhered to that requirement in determining whether a party has standing before this court. *See Riverside Hosp. v. District of Columbia Dep't of Health,* 944 A.2d 1098, 1103–04 (D.C.2008) (citing *Speyer v. Barry,* 588 A.2d 1147, 1160 (D.C.1991); D.C.Code § 11–705(b) (2001)); *see also Friends of Tilden*

*Park, Inc., v. District of Columbia,* 806 A.2d 1201, 1206 (D.C.2002). Nevertheless, this court is not bound by the case or controversy requirement of Article III. *See, e.g., Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *see also Atchison v. District of Columbia,* 585 A.2d 150, 153 (D.C.1991) (stating that "this court … enjoys flexibility in regard to [the case or controversy requirement] not possessed by the federal courts"). This is especially true when the Council has provided a cause of action. *See DeGroot v. DeGroot,* 939 A.2d 664, 668 (D.C.2008) ("the Superior Court is 'a court of general jurisdiction,'" and "'has jurisdiction of any civil action or other matter (at law or in equity) brought in the District of Columbia.'").

*Grayson v. AT & T Corp.,* 980 A.2d 1137, 1155 n. 78 (D.C.2009), *reh'g en banc granted, opinion vacated,* 989 A.2d 709 (D.C. 2010).[9]

A contrary interpretation would overrule any number of opinions in which we have consistently come to the conclusion that, as article I courts, the Superior Court of the District of Columbia and the District of Columbia Court of Appeals are not bound by article III's case or controversy limitation. That consistent interpretation is well-supported by express Congressional intent, that the District of Columbia's court system is to be "comparable to those of the states and other large municipalities." *Pernell v. Southall Realty,* 416 U.S. 363, 367, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974) (quoting H.R.Rep. No. 91–907, at 23 (1970)); *see* S.Rep. No. 91–405, at 18

---

9. Our opinions have not all adhered to the distinction between what is mandated and what we, by choice, require. *See, e.g., Friends of Tilden Park, Inc.,* 806 A.2d at 1206 (D.C. 2002) (suggesting that we apply "in every case" the "constitutional" requirement of a "case or controversy" and the "prudential

'prerequisites of standing'"). But *Friends of Tilden Park* and similar cases must be read in the context of their facts, which did not involve issues of mootness or suit under a statute that purported to eliminate the usual requirements for standing.

(1969) (stating that "[b]y creating the local courts under authority granted by article I of the Constitution, the local District of Columbia court structure is not bound by the provisions found in article III of the Constitution"). Thus, we have said, unlike the federal courts, the Superior Court is a court of general jurisdiction and courts of the District of Columbia have "powers analogous to those of state courts." *District of Columbia v. Group Insurance Administration*, 633 A.2d 2, 13 (D.C.1993) (quoting *Reichman v. Franklin Simon Corp.*, 392 A.2d 9, 12 (D.C.1978)). This court is to be "similar to a state Supreme court." H.R.Rep. No. 91–907, at 23.

The Constitution's "case or controversy" limitation is a crucial distinction between federal and state courts. For example, in the case of a plaintiff who had alleged no "personal stake in the outcome" of the case, the plaintiff could proceed as a private attorney general under the state courts in California, which are not bound by the case or controversy requirement, but not in the federal courts. *Nike, Inc. v. Kasky*, 539 U.S. 654, 661 & n. 2, 123 S.Ct. 2554, 156 L.Ed.2d 580 (2003). The distinction is rooted in the limited powers of the federal government and the historical role of state courts. In *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court explained that whereas federal mootness principles precluded a federal court from granting injunctive relief to a man who had been the subject on an unlawful choke hold by police because he was not likely to be imminently similarly injured, *id.* at 111, 103 S.Ct. 1660, the states had no similar disability and "may permit their courts to use injunctions to oversee the conduct of law enforcement authorities on a continuing basis." *Id.* at 113, 103 S.Ct. 1660.

Notwithstanding the express statements by both houses of Congress and our sustained interpretive history of the source and reach of the authority of the D.C. courts, appellees point to D.C.Code § 11–705(b) as indicating that Congress did, after all, mean to impose the constitutional "case or controversy" limitation on the judicial power of the D.C. courts. If so, it would be a jurisdictional limitation that the Council may not alter. *See* D.C.Code § 1–206.02(a)(4).[10] I disagree that the Congress intended to introduce indirectly, via § 11–705(b), a limitation that it expressly disclaimed when creating the D.C. courts. Section 11–705(b) provides:

> Cases and controversies shall be heard and determined by divisions of the [Court of Appeals] unless a hearing or a rehearing before the court en banc is ordered. Each division of the court shall consist of three judges.

D.C.Code § 11–705(b).

It is interesting to note, first, that this provision has never been deemed by this court to present an impediment to our decision, in the limited cases mentioned above, to diverge from the Supreme Court's jurisprudence interpreting the injury-in-fact requirement inherent in the case or controversy limitation. Nor has it been cited as a reason for our adoption of article III's injury-in-fact requirement. That we have done voluntarily "to promote sound judicial economy" and in recognition of the concept "that an adversary system can best adjudicate real, not abstract conflicts." *District of Columbia v. Walters*, 319 A.2d 332, 338 n. 13 (D.C.), *cert. denied*, 419 U.S. 1065, 95 S.Ct. 650, 42 L.Ed.2d 661

---

**10.** D.C.Code § 1–206.02(a)(4) provides in relevant part:

> (a) The Council shall have no authority to:
> ... (4) Enact any act, resolution or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)[.]

(1974). Moreover, the substantive import that appellees would have us read into § 11–705(b)'s use of "case or controversy" language is not supported by the article I source of Constitutional authority expressly cited by the Congress in creating and granting "judicial power" to the D.C. courts:

The judicial power in the District of Columbia is vested in the following courts:

(1) The following federal courts established pursuant to article III of the Constitution:

(A) The Supreme Court of the United States.

(B) The United States Court of Appeals for the District of Columbia Circuit.

(C) The United States District Court for the District of Columbia.

(2) The following District of Columbia courts established pursuant to article I of the Constitution:

(A) The District of Columbia Court of Appeals.

(B) The Superior Court of the District of Columbia.

D.C.Code § 11–101.

Consistent with "[t]he aim of the [court reorganization] Act ... to establish 'a Federal–State court system in the District of Columbia analogous to court systems in the several States,'" *Key v. Doyle,* 434 U.S. 59, 64, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977) (quoting H.R.Rep. No. 91–907, at 35), and the article I source of Congressional power invoked to create the District's courts, § 11–705(b) is properly read as an administrative provision directing the composition of divisions of the Court of Appeals in all cases other than those that are heard by the en banc court. This interpretation is consistent with the procedural nature of the other subsections of § 11–705, which deal with "the order and times" when the judges shall sit, *id.* at (a); and the procedures for selecting and hearing cases for en banc consideration, *id.* at (c) & (d). These procedural provisions are to be contrasted with those in D.C.Code § 11–721, which set out the "jurisdiction" of the D.C. Court of Appeals. To read § 11–705(b) as imposing a case or controversy limitation on the D.C. Court of Appeals would lead to truly anomalous and indeed absurd results in light of the jurisdiction that Congress clearly intended in § 11–721. As there is no provision with "case or controversy" language comparable to § 11–705(b) applicable to the Superior Court, it would mean that the Court of Appeals operates under a significant limitation on its power to adjudicate that does not similarly constrain the trial court over which we have appellate review of "*all* final orders and judgments." D.C.Code § 11–721(a)(1) (emphasis added); *see* D.C.Code § 11–721(b) (providing that "a party aggrieved by an order or judgment" of the Superior Court has a right to appeal). Alternatively, § 11–705(b) could be read to mean that the Court of Appeals need only decide cases that present a "case or controversy" in divisions of three, but that would mean that we have been wrong all along in thinking that adjudication of the merits of an appeal must be done by divisions comprised of three judges in all cases (other than those heard by the full court). I do not believe that the court has been misguided; rather, it has correctly understood that, as is the norm for appellate courts throughout the country, at least three judges should consider the merits of an appeal. Unfortunately, there is no legislative history to shed light on Congress's one-off use of the term "case or controversy" in § 11–705(b) in connection with the D.C. Court of Appeals. The likely explanation is that Congressional drafters inadvertently copied this term from an analo-

gous provision that applies to the federal appellate courts, or used the term as "shorthand" for "appeal" without realizing its implications as a constitutional term of art.

I therefore conclude that the D.C. courts have no constitutional or statutory impediment to their hearing or deciding cases that the legislature has said may be brought by a person "whether acting for the interests of itself, its members, or the general public," D.C.Code § 28–3905(k)(1), even if the plaintiff has not suffered injury-in-fact.

### III. Did appellants' complaints state a cause of action under the CPPA?

Although I conclude that Grayson and Breakman have standing to sue, I agree with the majority's analysis that Grayson's complaint did not state a cause of action under the CPPA and need not belabor the point here. As to the sufficiency of Breakman's complaint, which the majority does not reach because it concludes that Breakman has no standing to sue, I come to a different conclusion. Breakman's complaint alleged in Paragraph 22 that AOL charged existing customers double what it charged new customers for certain services and had failed to disclose the pricing differential to its existing customers. The complaint alleged that AOL violated the CPPA because it "fail[ed] to state a material fact if such failure tends to mislead." D.C.Code § 28–3904(f). If proven, the existence of a price differential of such magnitude for the same service would be material; appellee AOL claims, without citing controlling authority, that even though it would honor an existing customer's re-

quest to change plans to a lower price, it is not required by the CPPA to inform its customers of the price differential. The trial court dismissed Breakman's complaint on the ground that he lacked standing to sue and this court reversed, relying on the now-vacated division opinion in *Grayson.* Neither the trial court nor the appellate division of this court addressed whether AOL's failure to inform existing customers of the price differential violates the CPPA. Nor did they address appellee AOL's alternative argument, citing *Forrest v. Verizon Communications, Inc.,* 805 A.2d 1007, 1015 (D.C.2002), that Breakman's complaint must be dismissed because Breakman is bound to bring his claim in Virginia by an "online forum-selection clause." [11] These were not the issues for which the court granted rehearing en banc. At this early pleading stage, we are bound to assess the viability of Breakman's claim under Rule 12(b)(6) within the four corners of the complaint and assume that the facts alleged are true. In the absence of any controlling authority establishing that AOL's failure to provide information about a material pricing differential to its customers does not violate the CPPA or any evidence that Breakman has agreed to AOL's forum-selection clause, the complaint cannot be dismissed on either of AOL's arguments. I would, therefore, reverse the dismissal of Breakman's complaint and remand his case for further proceedings in Superior Court, without prejudice to the filing of a motion for summary judgment once the record is further developed.

11. There appears to be an important factual distinction between this case, where Breakman does not allege that he subscribes to AOL services, and *Forrest,* where the plaintiff was a subscriber who was held to be bound to the forum selection clause by having clicked "Agreed" to an online subscriber contract. 805 A.2d at 1015.